## Austin Wales v. Alexander H. Newbould.

Wales, who was administrator of the estate of Mrs. Newbould, his deceased daughter, and her only heir-at-law and next of kin, and also administrator *de bonis non* of the estate of Knapp, her first husband (who died without issue), upon which estate she had partially administered in her life time, filed his bill against Newbould, setting forth that on a settlement and compromise with Knapp's sister (who was his heir-at-law) of a claim the estate had against her, and of all rights in Knapp's lands, Mrs. Newbould, as widow and administratrix, agreed to take a certain portion of the lands, releasing the remainder to the sister; and that defendant, acting as his wife's agent in this compromise, had, without her knowledge, taken, in his own name a deed of the lands she was to receive, and sold the same: that he :had also become possessed of moneys received by her for her dower in certain other of Knapp's lands, and of a note she held against complainant, and certain other personal property which belonged to her at her decease. And praying that he account to complainant for the lands and dower moneys, and deliver over the note and other personal property, that it might be disposed of and distributed in due course of administration of the Knapp and Mrs. Newbould estates. Defendant answered, claiming that the lands, the dower moneys and the note, were given to him by Mrs. Newbould, but setting up no right to the other personal property, and claiming by his answer the benefit of a demurrer. On the hearing on pleadings and proofs he insisted that the bill was multifarious, as the complainant claimed in three distinct characters. Whether the bill was multifarious, *quere.*

The court in such case, if it finds the answer not sustained, will compel defendant to account to complainant, but will not undertake to determine how much of the property belongs to the one estate and how much to the other, nor how it shall be distributed, as these are questions to be passed upon by the Probate Court.

The complainant, as administrator of Knapp, electing to affirm the compromise under which the lands were deeded to defendant, and to demand the proceeds of their sale, the objection that this compromise was void, as against that estate, and that therefore the administrator has a remedy at law by resorting to the lands themselves, will not be listened to from defendant who acted on behalf of his wife in making the compromise, and has since sold to other persons the lands received. Especially as the case shows more personal assets than the amount of the debts proved against the estate, and it does not appear that the lands are needed for the payment of the debts of the estate.

The defendant objected that, as to the note and other personal property, complainant had an ample remedy at law.—*Held,* That though complainant might defeat an action on the note, by showing himself entitled to it as administrator, yet that this remedy was not adequate, as he was also entitled to have it delivered up to him. And that as defendant made no claim whatever to the other personal property, and complainant's title was not disputed, the defendant should be decreed to surrender it, notwithstanding the remedy at law was adequate.

The defendant claiming the lands, &c., by gift from his wife, the burden of proof is upon him to establish the gift. The fact that the deed of the lands was made to him, in the absence of .proof that it was so made by the wife's direction, consent or knowledge, is no evidence of such gift, and warrants no presumption against the wife's interest.

*Argued July 15th, 1859.*
*Re-argued April 12th, 13th and 14th, 1860. Decided Nov. 16th.*

WALES v. NEWBOULD.

Appeal from the Wayne Circuit in Chancery.

The bill of complaint set forth substantially the following facts:

Thomas F. Knapp, in his life-time, and John Thorn, owned together a certain tract of land in Port Huron, Michigan, the legal title to which was in Thorn. This tract was subdivided and platted, and Thorn had sold several lots before Knapp's decease, which occurred prior to 1848, but had not accounted for the proceeds. LaFayette Knapp and Eliza Knapp were the children and heirs at law of Thomas F. Knapp, the latter of whom married Frank L. Hunt, about 1848, and she, her husband and La Fayette, then filed their bill in chancery in the St. Clair Circuit, against Thorn, for a settlement and partition of the lands, and a preliminary decree was made in the cause, that one-half the lands belonged to said LaFayette and Eliza, as heirs at law of Thomas F. Knapp, and that Thorn was indebted to them $2500. Thorn died before this suit was finally determined, and it was revived against his representatives. In 1849, LaFayette married Cornelia H. Wales, the daughter of complainant, and in 1850 he died without issue, and his widow, by his death, became entitled to one-half the claim against Thorn, and also to a claim of $3000 against Mrs. Hunt for her support by LaFayette Knapp. Cornelia was made a party to the St. Clair Chancery suit. Defendant and Cornelia intermarried in October, 1852, when he also was made a party to the suit, and a final decree was subsequently made in it, that the $2500, be paid by the Thorn estate to the heirs of Thomas F. Knapp either in money or in lands, and the one-fourth of the land was decreed to be in Mrs. Hunt, as such heir, and another fourth as heir of LaFayette, subject to the rights of Cornelia, his widow, and who had been appointed administratrix on his estate. The heirs of Thomas F. Knapp elected to take the $2500 in lands, and eighteen lots were set off to Mrs. Hunt, by commissioners appointed for the

purpose, in satisfaction of this sum, but subject to all the rights of said Cornelia. The balance of the land was then divided between Mrs. Hunt and the Thorn estate.

June 6, 1853, an agreement was entered into between Mrs. Hunt and Cornelia, (Mrs. Newbould) — who still, notwithstanding her marriage, continued to act as administratrix on the estate of LaFayette Knapp — that Mrs. Hunt should give Mrs. Newbould the eighteen lots in full of the $3000 claim, and of one-half the $2500, which she claimed as representative of LaFayette Knapp, and also seven other lots in full of her claim, as widow of LaFayette, upon the lands set off to Mrs. Hunt, as his heir. The lots were to be conveyed by Mrs. Hunt to Mrs. Newbould, and the latter was to give to one Trusdail, for Mrs. Hunt, a quit claim deed of the remainder of the land. This quit claim deed was executed accordingly. Mrs. Newbould, and her husband also, as a part of the same arrangement, gave Mrs. Hunt an indemnity against any claim which the estate of LaFayette Knapp might make against her.

In all these transactions, defendant acted as his wife's agent, and she delivered to him, at Detroit, the deed to Truesdail, to take to Port Huron, and exchange for the conveyance from Mrs. Hunt. Instead, however, of taking the deed from Mrs. Hunt in his wife's name, he took it in his own, so that the legal title was vested in him contrary to her expectations and directions — a fact which she never knew during her life time.

LaFayette Knapp, in his life time, owned an interest in a farm near Detroit, and Mrs. Newbould sold her right of dower therein to John Owen, and took his note for $500 therefor, which she delivered to her husband, to collect for her. He collected it, but never accounted for the money. She also, before her marriage with him, and afterwards, owned several articles of personal property, which defendant has and retains.

After LaFayette Knapp died, and before his widow

married defendant, complainant owed her $926, for which he gave her his note. Before her death, defendant got this note, and now holds it. Defendant also holds a note, given him by complainant, for $1086.70, and about September 5, 1857, he sued both these notes in the Wayne Circuit Court, when he ought not to recover on the first at all, nor on the second till all the matters above set forth are settled.

Mrs. Newbould died February 23, 1855, leaving complainant her heir at law, who thereupon took out letters of administration on her estate, and finding LaFayette Knapp's estate not fully administered upon, and debts allowed against it, he also took out letters *de bonis non* upon that.

The bill prays for a full account of all property conveyed to defendant by Mrs. Hunt, and of the sales thereof by him, of the moneys received by him of Owen, and of all her personal property; that he may assign the same to complainant, and that all the property belonging to the estates of LaFayette Knapp and Mrs. Newbould may be disposed of in due course of administration.

The answer avers that Mrs. Newbould requested defendant to take a deed of the 25 lots in his own name, and as his own property, and the deed was so made at her request. She knew afterwards that he was using and selling these lots as his own, and never objected. It denies that the deed to Truesdail was delivered to him to take to Port Huron for exchange, but says all the papers were exchanged at Detroit, where the parties then were. The answer also claims, that the moneys received from Owen, and the note of $926 against complainant, were given to defendant by his wife. And it insists that complainant has made by his bill no case entitling him to relief; that the bill is multifarious; that as to the personal property the remedy is in a court of law; and that complainant has mingled matters of his own with matters pertaining to

the LaFayette Knapp estate, and Mrs. Newbould's estate, and defendant claims the benefit of demurrer.

The following is the most material evidence in the case:

*Henry T. Backus* (who represented the Thorn estate in the adjustment), testified on behalf of complainant, that Newbould acted on behalf of himself and his wife. "He acted as the husband of Mrs. Knapp. I so understood it from Mr. Newbould. From his actions and what he did, I have no hesitation in saying that Mr. Newbould was acting in behalf of the interest of his wife. I did not get any impression from defendant that he had any interest in the property, except through his wife. I had no conversation directly with defendant about the property or his interest. I do not know anything about the title to the property as between defendant and his wife, except by inference. I do not know to whom the property was eventually deeded on the adjustment. I had no further connection with it except as to the Thorn estate."

*Edwin A. Wales*, sworn, on the part of complainant:

"The $2500 mentioned in the decree in the chancery suit at St. Clair, and also in the pleadings in this suit, was a balance due from the Thorn estate to the Knapp estate, and belonged to LaFayette Knapp and Eliza A. Hunt, who were the only heirs of Thos. F. Knapp. I was the attorney of L. Knapp in his lifetime, and acted for Mrs. Knapp during her widowhood, having charge of all the books and papers belonging to the estate of L. Knapp. I found upon the books and other evidences, claims against Eliza A. Hunt, formerly Eliza Knapp, to very near $3,000. It was for debts paid by Mr. Knapp during his lifetime for her, money advanced by him in and about the St. Clair chancery suit, and his ledger and book account for supplies furnished Mrs. Knapp."

"On the 6th of June, 1853, the lots mentioned in Schedules B and C annexed to bill were set apart to Mrs. New-

bould, in settlement [the 18 lots and the 7 lots]. The entire of the eighteen lots being set apart for the $3,000 and the half of the $2500, and the seven lots for her dower. Including some disbursements made by defendant, the claim of Mrs. Newbould, including dower, amounted to $7,670 99. This claim was compromised at an agreed amount of $3,500. The lots were estimated at same value, and taken in payment of all the claims. All of Mrs. Newbould's interest in the balance of the property she was to convey to Mrs. Hunt. Mr. Newbould, the defendant, co-operated with the attorneys for the parties in bringing about the settlement as above set forth. This was after the marriage of defendant with Cornelia. Cornelia herself did not take an active part. The arrangement was made at Port Huron. Mrs. Newbould was not there; she was in Detroit, and had no personal knowledge of it at the time. Mr. Newbould, the defendant, Mr. H. H. Emmons and myself, acted on behalf of Mrs. Newbould. I do not know positively that Mrs. Newbould knew that the deed was directed to defendant and not to Mrs. Newbould, — the deed of lots taken for her said claim. I do not know anything particular about it. I do not know that Mrs. Newbould expected to receive the proceeds of sales of said lots made by defendant. Never heard defendant say anything to the effect that she should have the property, or that he would keep the property separate."

*Cross Examination:* "The settlement I have referred to between Mrs. Hunt and Mrs. Newbould in relation to St. Clair property, was the result of a negotiation of three or four days. The papers and exhibits annexed to my direct testimony were made out at Port Huron, while we were negotiating for the settlement. It was contemplated that the settlement was to be carried out by the execution of final papers. Mrs. Newbould was not there at the time of the negotiation. There was some controversy about the claim for $3,000, and that controversy was the reason why the claim was compromised.

*Question* — Was not the result of the negotiation an agreement that Mrs. Hunt and husband should convey the lots to Mrs. Newbould or whoever she directed, and that Mr. and Mr. Newbould should receipt the account, and indemnify Mrs. Hunt, in behalf of all claims from the Knapp estate?

*Answer* — Not so far as the defendant was concerned, to my knowledge. It was agreed that the account should be released and discharged.

Mrs. Hunt was to transfer the absolute fee to Mrs. Newbould in consideration of the release and discharge of this account, &c. It was understood that Mrs. Hunt was to convey all the interest she had to Mrs. Newbould. The design was to put the fee of those lots in Mrs. Newbould absolutely, and, as to other property, in Mrs. Hunt."

*Direct resumed* — " The result of the negotiation, so far as the description of the property is concerned, is embodied in *Exhibit B*, hereto annexed, and was drawn up at Port Huron, at the time of the negotiation. I do not know that anything was said during the negotiation, by any one, in relation to putting the property in the name of defendant."

" I had several conversations with Mrs. Newbould in her lifetime, in which she repeatedly stated that her husband seemed very particular about keeping her property separate from his own. On one occasion she asked me what I thought of her taking two houses, one of which they occupied, of defendant in exchange for her Port Huron property. I stated to her my objections to her taking the property in exchange, as the houses were on leased land. She always in her lifetime spoke of the property as her sole and separate property, and frequently commented upon the defendant's delicacy in regard to the management thereof, and seemed to commend him for his apparent disinterestedness. I have heard her several times talk with other members of the family about this property. I had never

known her to treat it as the property of her husband, or intimate that she designed it should become his. These conversations were had on several occasions."

*Gilbert C. Davidson*, sworn on the part of defendant:

"I reside in Albany, N. Y. I knew Mrs. Newbould in her lifetime. I have been for a long time intimately acquainted with defendant—about twenty years. For the past six or eight years I have been in Detroit two or three times a year, and I was in the habit of making the residence of defendant my home while in the city. I was on very intimate terms with the family, and constituted one of the family of defendant always when in Detroit. The defendant and his wife were in the habit of talking confidentially to me of their business and other affairs.

*Question*—State whether or not you ever knew from Mrs. Newbould whether she became entitled to property situate in Port Huron, and which was originally owned by John Thorn and Thomas Knapp, which was at one time in litigation between Thorn and the heirs of Thos. Knapp—or any interest therein. State fully.

*Answer*—I know that she said to me that she owned property in Port Huron, which came to her through the Knapp estate, *i. e.* her husband, LaFayette Knapp. She said to me that she desired and had placed in the defendant the title to that property, to be his absolute property. Defendant declined (as she stated) at the start, to have anything to do with the property. The defendant declined to have anything to do with the property at the start, because that in the chances of business he might fail — it would be better to have it in her own name; but she refused to have anything to do with it. She absolutely declined to have anything to do with the property, and said if he failed in business she could go into the kitchen to work. She also said that if it had not been for defendant she would never have got that Port Huron property. She

talked about all the property she had, personal as well as real, and desired that all should be in him during her life, as well as after death. We had such conversations oftentimes, time and again. Invariably her conversations were of the same tenor as I have testified.

*Cross examination:* The first conversation was between January, 1852 and 1854. I have talked with her often. All the conversations were after her marriage with defendant, at his two houses on Jefferson avenue, Detroit: I did not have any conversations with her at any other place about this property. I do not know that any one was present. I think that defendant was present at none of the conversations. I knew her before she married defendant. I knew her from as early as 1845, 1846, or 1847. I knew her and was intimate with her and her family. The conversations were introduced by talking about defendant's affairs and about mine. I was intimate enough for that. I can not give an instance when any of these conversations took place in the presence of any one else. She was not in the habit of talking much. My acquaintance with the Wales family (her family), has continued up to the present time. I did not communicate any of these conversations to any one but to defendant during her lifetime. I have talked these matters and others over with defendant while she was alive. Can not recollect, but I think I may have told what she said. I talked the matter over with the defendant; defendant refused, at the start, to have anything to do with her property. I heard him say he did not want her property, at the start, but afterwards I never heard him say so. After the defendant got the property into his hands I never heard him say he did not want and would not have anything to do with it. I never heard him say that he intended that her property should be kept separate and for her own use. I never had any conversation with defendant before I talked with her, and what she stated to me she said of her own

free will. I can not state the number of conversations, but I should think as often as twenty times.

*Direct resumed*—Defendant and myself, from our long and extreme intimacy, were in the habit of talking over freely all of our business affairs. My intimacy with defendant has been even greater than with my own brothers."

The court below dismissed the bill, and complainant appealed.

*Holbrook & Bishop*, for complainant:

1. The bill is not multifarious.—19 *Ala.* 814; *Story Eq. Pl.* § 76 *a, b*, 278 *a*, 279 *b;* 7 *Sim.* 564; 1 *Myl. & Cr.* 603; 4 *Myl. & Cr.* 17, 31.

If it be determined that some of the matters are not of equitable cognizance, the court may nevertheless adjudicate upon the rest. — *Story Eq. Pl.* § 283 *and note;* 1 *Craig & Phil.* 197; 8 *Sim.* 467; 3 *Myl. & Cr.* 85; 5 *Paige*, 137, 160; 18 *Ala.* 439.

Independent claims between the same parties may be litigated in one suit:—1 *Sim. & Stu.* 313; 6 *Mad.* 94; 27 *Miss.* 419.

It is impossible to lay down any general rule as to multifariousness. There is none on the subject, even on demurrer, and the courts will always exercise a sound discretion, and consider what is most convenient in all cases: 1 *Myl. & Cr.* 618; 21 *Miss.* 234; 12 *Geo. R.* 61; 3 *How.* 619. The objection of multifariousness is discouraged by the courts: — 12 *Geo. R.* 61. And see *Story Eq. Pl.* §§271, 539; 2 *How*, 619, 642.

But the objection comes too late.. It should have been taken by demurrer:—2 *Sch. & Lef.* 370; 5 *Mad.* 80; 5 *How.* 127; 32 *N. H.* 9; *Story Eq. Pl.* § 284 *a*.

2. The defendant claims this property simply and especially as a *gift* from his wife. He is bound by the case he makes, and must hold the property *as a gift*, or not at all.

But a *feme covert* can not thus give property to her husband, even if it was hers to give. — 2 *Kent*, 106 ; 4 *Dana*, 142 ; 1 *Greenl. R.* 394 ; 3 *Greenl. R.* 63 ; 2 *Barr*, 67 ; 7 *Johns. Ch.* 60 ; 10 *Vesey*, 580 ; 33 *Penn. St. R.* 525, 526.

There is nothing which can help defendant in the statutes of this state for the protection of the rights of married women before 1855. [These statutes the counsel reviewed at length, and in the same connection referred to 33 *Penn. St. R.* 525 ; 5 *Duer*, 476 ; 24 *Barb.* 581 ; 1 *Dutch.* 302 ; 12 *S. & M.* 347 ; 16 *Ark.* 154 ; 3 *How.* 624 ; 28 *Vt.* 765 ; 11 *Md.* 29 ; 28 *Mo.* 47 ; 24 *Miss.* 85 ; 7 *Johns. Ch.* 229 ; 1 *Bradf.* 64 ; 2 *Kern.* 202 ; 28 *Barb.* 343 ; 18 *N. Y.* 265.]

*S. T. Douglass* and *W. Gray*, for complainant:

1. The bill is fatally defective in its frame, and must be dismissed on that ground.

If we regard the complainant as one person suing in different capacities, the bill is defective for the want of certainty in the statement of the title upon which he grounds his claim to relief.

He claims the same property, or the same account, in each of his two representative capacities, and also in his individual capacity; or in other words, sets up three alternative and inconsistent titles to the same thing.

This is not permitted, because it is unjust to the defendant, in that it does not apprise him with sufficient certainty what case he is called upon to meet, and imposes upon him a needless and unreasonable burthen in preparing to controvert, both upon the law and by evidence, several distinct titles at once, without knowing which in the end will be relied upon. If permitted, it would lead to serious and wholly unnecessary prolixity and confusion in judicial proceedings. It imposes upon the court the onerous and unreasonable duty of selecting out of many different and

inconsistent titles the one which, if any, can be supported. 5 *Story*, 333, 334 ; *Story Eq. Pl.* §§ 241, 510.

If we regard the complainant, in each of the three different capacities in which he sues, as in the eye of the law so many different persons, it is equally uncertain in the statement of title, and is also fatally defective on the ground of a misjoinder of complainants. — *Story Eq. Pl.* § 510. [Counsel in this connection also referred to *Calv. on Parties*, 87 ; 3 *Mason*, 333 ; 3 *Story*, 25, 51 ; 2 *Sim.* 332 ; 2 *Sim.* 329 ; 4 *Sandf. Ch.* 31 ; 10 *Yerg.* 386 ; 6 *Dana*, 186 ; 1 *Stock.* 483 ; 3 *How. Miss.* 258 ; *Ibid.* 155 ; 4 *Johns. Ch.* 199 ; 4 *Blackf.* 251 ; 4 *Beav.* 557 ; 1 *Sim. & Stu.* 108 ; 2 *Ves.* 327 ; 9 *Ala.* 351.]

The objection being distinctly taken by the answer, is available at the hearing : — 2 *Myl. & K.* 235 ; 1 *Myl. & Cr.* 433 ; 6 *Paige*, 273 ; 13 *Pet.* 375 ; 4 *Paige*, 515 ; 1 *Keene*, 619 ; 1 *Myl. & K.* 559.

The court ought to dismiss the bill *sua sponte.* — 1 *Myl. & K.* 559 ; 7 *Ala.* 425 ; 11 *Ohio*, 456 ; 4 *Hare*, 557 ; 13 *Pet.* 375.

If the bill is bad for the defects alleged, it can not be made the ground of partial relief. — 5 *Gill*, 359 ; 2 *Gill, & J.* 14 ; 16 *Ala.* 87.

2. Mrs. Newbould made a valid gift of all her separate estate to her husband during her lifetime.

Of the capacity of a feme covert to give her separate property to her husband, as well as to any other person, if her disposition of it be free and not the result of flattery, force, or improper treatment, there can be no reasonable doubt. — *Comp. L.* § 3289 ; 2 *Kent*, 165, 166 ; 17 *Johns.* 548 ; 5 *Barb.* 225 ; 7 *Ohio St. R.* 208.

We concede that transactions between husband and wife, in regard to the wife's separate estate, should be viewed with great jealousy : yet they should be judged of fairly and justly, and in the light of all those presumptions which arise out of a just view of the nature of the relation be-

tween them, and the motives which usually actuate persons in that relation. — 7 *Ohio St. R.* 208, 216; 11 *Md.* 415; 17 *Johns.* 584; 5 *Barb.* 225; 29 *Ala.* 244, 252, *and cases cited* 22 *Conn.* 289; 4 *Md.* 280; 11 *Eng. L. & Eq.* 106.

Examine the evidence. Reading it in the light of these presumptions, there is no reasonable doubt that Mrs. Newbould, during her lifetime, did give all her property to her husband freely and voluntarily, and without fraud, persuasion, or undue influence on his part.

This gift included her interest, or the proceeds of her interest, as distributee, in the unadministered estate of L. Knapp. — 2 *Kern.* 202.

3. Mr. Newbould, as husband, was entitled *jure mariti* to all the personal property of his wife on her decease intestate.

Such was the husband's right at common law, and it is not affected by the statutes of distribution. — *L.* 1833, *p.* 308, §§ 1, 2; *p.* 310, § 8; *R. S.* 1838, *p.* 279, § 1; *p.* 267, § 1; *p.* 280, § 3; *Comp. L.* §§ 2877, 2812, 2879; *Bright on H. and W.* 41, 42; 1 *Wms. on Ex.* 336; 2 *Ib.* 1271, 1275, 1276, *sec.* 1; 3 *Ves.* 246, 247, *and note* 2; 34 *N. H.* 445; 3 *N. H.* 129; 9 *N. H.* 321; 5 *Fost.* 342; 2 *Dev.* 360; 4 *Ired. Eq.* 56; 1 *Yerg.* 418, 426; 10 *Yerg.* 222, 223; 28 *Barb.* 635; 1 *Green. Ch.* 247; see 25 *Ala.* 195.

Nor by the married woman's act. — *C. L.* § 3289; 28 *Barb.* 633.

4. Whether the defendant takes the property as donee of his wife, or as husband *jure mariti*, he is liable to account to complainant only to the extent of the debts due from Mrs. Newbould's estate. — 4 *Rice Ch.* 107; 2 *Mich.* 381.

MARTIN CH. J.:

Wales files this bill to obtain from the defendant an account of the property of the late Cornelia Newbould, which came into his hands during her life, and of the avails

of such as has been sold by him, and for payment of such moneys as have been received therefor, and a delivery of such of the property as remains in the defendant's hands. In doing this, he sets forth the several relations in which he stands to the estate of the late Cornelia Newbould, alleging that he is administrator of such estate, administrator of that of Knapp, from and through which a large portion of the property was acquired, and her heir at law and distributee, and as such entitled to any residuum left after administration. For this description of the characters in which he claims and may claim title to the subjects of this litigation, and that of his relation to Mrs. Newbould's estate, the bill is charged to be multifarious.

I shall not attempt to define multifariousness, for the failure of every court to do so hitherto shows its impossibility. The question, to a great extent, depends upon the facts of each particular case, and the nature of the relief prayed for by the bill. But in any event, to hold a bill multifarious, the court must be able to see that disconnected and independent causes of action are brought upon the record, requiring different and independent decrees, or that the defendant is brought upon a record with a portion of which he has no connection, or in which the different complainants, if there be more than one, have no common interest. It sometimes, therefore, means misjoinder of causes of action, and sometimes misjoinder of parties. See *Daniell's Ch. Pr.* 384, 385; *Story's Eq. Pl.* §§ 271, 530 *and note* 6. In the present case there is a misjoinder of neither. The complainant is actually the only party entitled, in any capacity, to litigate the questions involved against the defendant, and the subject matter is the right of the defendant to the property claimed by the complainant to have belonged to Mrs. Newbould, but which the defendant claims in his own right. The manner in which, and the source from which she acquired such property, although necessary subjects of inquiry to determine these conflicting

claims, do not raise any conflicting issues respecting her title, for that is the common source of the claim of both parties. The title to her property centres in either the complainant or the defendant. If in the defendant, the bill will be dismissed; if in the complainant, the defendant must be content to surrender the property in his hands, and account for and pay to the complainant the proceeds of such as has been sold; and in its ultimate use and appropriation by the complainant he can have no interest, unless as a creditor of her estate. Now, although distinct matters, in different rights,—as unconnected demands against different estates—can not be united in a bill without rendering it multifarious, yet distinct matters in the same right may be joined. And so, several parties may join in a bill where there is a common interest in the subject of controversy. Indeed a primary rule of pleading in equity, is, that all persons should be made parties who are interested in the subject matter, or whose rights may be affected by the decree; and although this rule has been somewhat relaxed by modern decisions, so that the absence of some of those who might have been joined as parties, will not necessarily require a dismissal of the bill, yet their being parties can be no fatal objection to it in any case. If such be the rule, it is difficult to find any valid reason for holding that, where the same subject matter is claimed by a single individual, in distinct but consistent and dependent rights, or where several interests are united in him, he may not maintain a bill in his own name, setting forth such rights and interests as grounds of his claim, and descriptive of his interests, and the characters in which such claim is made. And it is far more difficult, upon any equitable or rational ground, to find any reason why he should be required to select, out of several valid titles, one upon which he will found his claim to relief, when in fact he may be entitled to it upon all, or when each independent title is but a link in the chain upon which his whole title and his several rights depend. Equity recog-

nizes and enforces no inflexible technical rules of pleading which will operate to deprive a party of his rights, or compel a multiplicity of suits to attain a single object, or to settle conflicting claims respecting the same property.

But in the case at bar, the complainant claims, primarily, as the administrator of Mrs. Newbould's estate. It is true that in the introduction to his bill he does not describe himself as such, but in the body he clearly avers such character, and claims relief in it. I conceive this to be sufficient to authorize the court to afford him relief as such administrator. He also—and it is because of his various interests that he has framed the bill as we find it—avers that he is the administrator *de bonis non* of the Knapp estate; and that he is such, for the purpose of settling Mrs. Newbould's estate, the settlement of the latter depending in some degree upon the settlement of the former. But he alleges this as subordinate to his character as administrator of Mrs. Newbould, and claims nothing as administrator of Knapp, except in aid of his administration of the estate of Mrs. Newbould, as a very large, if not the major, portion of the property of the latter estate was derived from the former, and the settlement of the one depends upon that of the other. The complainant also alleges that he is the heir at law and distributee of Mrs. Newbould, but he makes no claim and asks no decree to himself as such. This, therefore is mere *descriptio personæ*, and in no manner affects the issue. But, were it otherwise, the joinder of the heir or distributee as co-complainant would not, I think, be a fatal objection, even were he a distinct person from the administrator; and I can conceive of no substantial reason why the allegation by a complainant of his several actual and prospective rights and claims, all being connected and dependent, should bar a decree based upon an actual right, fully set forth, and upon which relief is really prayed. So far as the defendant is concerned, if he be found to have no right to the property, it is of no concern to

him that the complainant has several connected claims, and the litigation is no more complicated when several rights and claims center in one person, than when held by many. In *Rhodes v. Warburton*, 6 *Sim.* 617, where legatees of a testator and the executor joined in a bill for a debt due the testator, the bill was held not demurable for such joinder. See also *Lewis v. Edmund*, *Id.* 251.

In *Cassells v. Vernon*, 5 *Mason*, 333, a claim to money as administrator and in the complainant's individual right was held to be inconsistent, as the admissions of the one necessarily superceded the other, and this upon the ground that distinct and independent titles can not be set up in the same bill. But, admitting this to be good law, it by no means follows that distinct, but dependent or connected titles, may not be set up by a complainant, or that he may not set out all his claims without danger of the dismissal of his bill.

In that case the right of action was not derived from a single source, but was asserted upon independent grounds; while in the present case, all the complainant's rights flow from one source, although his duties under them may be different. But it is his right, and not his duty, which is now in question; and as he and the defendant each claim from a common source, there can be no sound reason shown why the complainant should be driven to institute several suits to settle his respective claims to a single subject, when the rights of the parties must be substantially determined by the same evidence in each case, and upon the same general principles of law. Here the complainant has, to use the language of Judge Story in *Scott v. Calvert*, "a common interest" in the whole subject of the bill, and none of the objections applicable to multifariousness apply.

Now, as already remarked, the claim of the complainant as administrator *de bonis non* of Knapp's estate is not independent of that as administrator of Mrs. Newbould's estate. It is rather concurrent with it; the settlement of

the latter being to some extent dependent upon that of the
former; for, as is admitted by the defendant's counsel, the
title to the property acquired from that estate upon the
compromise of the litigation concerning it, is or may be
still subject to all rights of Knapp's administrator, and these
are centered in this complainant. Now regarding the defend-
ant, according to the theory of the bill, as having acquired
the title to such property as the trustee of his wife, and
as having disposed of it as such trustee, or, according to
his own theory, as having acquired it by gift from her
through such settlement, he can not question the right of
Knapp's administrator over the property, if the necessity
for its appropriation to the satisfaction of claims against
the estate is established, nor over the proceeds if it has been
sold; while if he holds it only as trustee, he should account
to the administrator, and can have no interest in its final
disposition under the order of the Probate Court, where
these estates must be finally settled. Nor, if he has con-
verted this property into money, can he resist the claim to
such money, if the administrat or chooses to suffer the title
to remain quiet in the bona fide purchasers, and pursue the
proceeds of the sale. But in the present case, as the amount
of Mrs. Newbould's interest which the complainant claims is
dependent upon the settlement of the Knapp estate, he may
call for an account of such proceeds as the defendant has
realized from the sale of property acquired from it, how-
ever acquired. Nor can he insist that such interest of
Mrs. Newbould was personalty, for he received it as realty,
and must account for it as such. How it may be regarded
for the purpose of administration is no concern of his,
for he has no interest in the question. As the estate of
Mrs. Newbould, and the rights of the complainant through
it, are dependent, so far as the eighteen lots or the pro-
ceeds of their sale are concerned, upon the settlement of
the Knapp estate, and the questions of right and amount
are thus blended, the complainant's character as adminis-

trator of the Knapp estate, is in no way conflicting with that of administrato. and distributee of Mrs. Newbould; and the averment that he has, or may have, rights in the former capacity, will not be fatal to his recovery in any other consistent and legitimate capacity. Consistent and dependent rights and titles may always be set up and relied upon by a complainant, when the bill does not require an adjustment of such rights, but a decree only which shall place the complainant in a position to settle them in another form. Were we exercising the power of a probate court, and this claim against the defendant made before us as such, the case might be different, for our duties would be different. But the defendant can not, beyond the question of misjoinder of interests, litigate this question, as he derives his title to those lots from the heirs of that estate, through Mrs. Newbould's interest therein, and his claim is based upon her right. He can not be permitted to question his own title and still insist upon it; and therefore we may start in this suit where he starts in his answer, with the deed claimed by him to be the gift of his wife, which was executed by Hunt and his wife in the process of partitioning the property, in pursuance of a decree of the St. Clair Circuit Court. This was a compromise and settlement of all conflicting claims among the heirs, and the defendant and his wife, by the obligation given to Hunt and his wife at the time of this settlement, virtually bound these lots and their proceeds to answer the demands of any future administrator who might be appointed upon such estate; for they undertook to indemnify Hunt and his wife from all liability for such conveyance to any future administrator. As between himself and his wife, were she living, the defendant could raise no question, except as to the nature of his title; and as to the claims of this complainant representing her estate, he has no greater rights. What may be the final disposal of the property, what estates

may be settled with it, and how settled, are questions in which he has no concern, if he be found to have no rights in it; and as all interests adverse to him are before the court, the satisfaction of any decree against him will fully protect him from any future liability to any one. See *Story's Eq. Pl.* § 279*b*; *Blease v. Burgh*, 2 *Beav.* 221.

Aside from this property, which was derived through the Knapp estate, and its avails, and the note for $926, which the defendant claims to have been given to him by his wife, there is other property which it is conceded the defendant is liable to account for to her administrator; and, as we think, to this complainant under this bill. The questions of fact to be considered are, therefore, whether the defendant acquired the Port Huron property, the note for $926, and the other moneys mentioned in his answer, by gift from his wife.

As to the note and money there is no evidence to show such gift, nor any evidence whatever respecting his right to hold them; and the presumptions are strong against any gift. A daughter would hardly bestow a note executed by her father upon any one, not even her husband, as a gift unless for some strong reason. The defendant has alleged the gift, but he has not proven it, or shown any reason to render it probable. As to the real estate, the defendant claims that the title was taken in his name with his wife's knowledge and consent, and with her intention that it should be conveyed to him as her gift. There is no evidence upon this point except the deed itself, the testimony of E. A. Wales, and of Davidson. The deed of itself proves nothing; as the law could presume from the facts surrounding the acquisition of the title, and the relations of husband and wife existing at the time, that he acquired the title for her, and would regard him as her trustee, not by contract, but by force of the transaction and such relation. The testimony of Wales, so far as it shows any thing, shows that the settlement and partition were made

for her, and although he was her brother and attorney, he appears not to have known that she ever entertained the design of gratuitously conferring this property upon the defendant. He was not present at the execution and exchange of the deeds, but, had such a design existed, from their relations it is exceedingly improbable that she should not have imparted a knowledge of it to him. The testimony of Davidson is so indistinct as to time, so improbable and immaterial, that I am compelled to exclude it from consideration altogether. He resides at Albany, and was only transiently here, and yet, if we believe his testimony, we must believe that he possessed her confidence in a degree superior to that of her own brother, if not of her husband; and that she concealed from all but him her benevolent purpose of bestowing this property upon the defendant.

If she had entertained any such design, it is utterly improbable, if not impossible, that the same should have been concealed from her attorneys, or that the person who received instructions to draw the deeds, and the witnesses, or some of them, should not have known of such intention ; and the fact that none of them were called to testify in this case, tends far more strongly to prove that she entertained no such design, than the testimony of Davidson does to establish it. It is not probable that she was present in the attorney's office while the deeds were being drawn. She naturally confided all the details to her husband, and her acquiescence in the conveyance proves no gift, for she had never had the title to give. If she gave directions for the deed to be made to her husband, this should have been and could have been proven; and the burthen is cast upon the defendant to show it and her purpose. All the facts and circumstances show this, and only this; that the defendant was her husband, adviser and agent in this settlement, and that she left the whole matter to his direction, and if she had subsequently ascertained, or even if she at the time

knew that the deed ran to him, her affection for, and confidence in him would have allayed any suspicions that he acquired the title for himself, or any doubts of the propriety of his proceeding. She might have thought that the title should properly run to him, as her husband, but it would be a monstrous and unnatural inference from these facts alone, to find that she was bestowing this property upon him as a gift. She is not shown to have been present when the deed was drawn, nor to have given any instructions respecting it; no act was done by her which manifested an intention to give, or which could operate to give. She has granted nothing, and nothing appears which will justify the presumption required by the defendant, and none can be made against her interests; but the proof should be clear and conclusive.

But the claim that the note for $926, executed by her own father to her, was also given to the defendant, which is part and parcel of this general claim, is so unreasonable that it also throws doubt over this of the gift of the real estate. However much she might have confided in her husband, or however great might be her generosity, it is hardly probable, and indeed scarcely possible, that she should have bestowed upon him this demand against her father. Before we can find a gift to have been made by the wife to the husband, we must have evidence of a different character from that before us.

The question of her right to give her real estate to her husband does not arise in this case, as the fact of a gift is not proven. ·

It is not necessary for the complainant to prove fraud on the part of the defendant to sustain this bill. He does not charge direct fraud, but that the title of Newbould was acquired without the knowledge and consent of his wife, and in fraud of her rights. This relates to the title, and not to his acts, and the facts of the case without other proof are sufficient to sustain the charge. The averment

is of a legal conclusion, and the rule contended for by the defendant's counsel does not apply in this case. The defendant having alleged a gift, the burthen was cast upon him to show it; the possession of the title, under circumstances like these before us, not warranting any inference of it, or presumption against the wife's interest.

The bill prays that the note of $926 may be decreed to be given up to the complainant, as also the personal property, and that the suit pending in the Wayne Circuit Court be enjoined. So far as the personal property is concerned, as the defendant asserts no title to or interest in it, he should be decreed to surrender it: as to the note for $926, a decree must be entered, that the injunction against its prosecution be made perpetual, and that it be surrendered to the complainant; but as to the note for $1056, we can make no decree. The defendant is at liberty to prosecute that to judgment, and in other respects a decree should be entered according to the prayer of the bill, except so far as relates to the disposal of the property in course of administration, which is left to the order and direction of the proper Probate Courts. As we do not find the title to the real estate to have been acquired by actual fraud, and hold the defendant to have been the trustee of the title, in taking the account of the proceeds of such real estate and other trust moneys in his hands, the defendant must be allowed for all taxes paid by him upon the trust property, and for all necessary expenses incurred and necessary disbursements made by him, in the due and proper management of the trust property, and for all moneys paid out, and expenses necessarily incurred by him in the St. Clair chancery suit, and the compromise thereof. He must also be allowed (should he claim it) a reasonable compensation for his time and services as the agent of his wife, about the said chancery suit, and the compromise thereof, down to the time when the deed of the Port Huron property to him was executed, but not after; such accounts to be taken

before a Commissioner, on reference, and passed upon as in other cases, and the case must be remitted to the court below for the execution of this decree, and for further proceedings.

MANNING J., *dissenting:*

Complainant had a daughter, named Cornelia, who married one Knapp, in 1849. In April of the following year, Knapp died without issue, leaving complainant's daughter his widow, and an only sister who had married one Hunt, surviving him. In October, 1852, his widow married defendant Newbould; and in September, 1854, she died without issue. Knapp and his sister, as heirs to their father, who died previous to 1848, claimed an interest with one Thorn in certain real estate, situate in the village of Port Huron, the legal title to which was in Thorn; and a bill was filed by them against Thorn, in the Circuit Court for St. Clair county in chancery, to establish their right, as heirs to their father, to an undivided half of the property, and for a partition of it. Pending the litigation, Knapp died intestate, and his widow took out letters of administration on his estate, and was made a party to the suit in chancery; and after her marriage with defendant he was made a party. The chancery suit terminated in favor of complainants, and a partition was made of the property, a part of which was set off to Knapp's estate. Afterwards in a settlement between Mrs. Newbould and Mrs. Hunt, of their respective interests in the estate of Knapp, it was agreed between them that Mrs. Hunt should convey to Mrs. Newbould a certain part of the property, and that Mrs. Newbould should quit claim her right in the rest of it to Mrs. Hunt. And on the seventh of June, 1853, the agreement was consummated by the execution of a quit claim deed by defendant and his wife to Wesley Truesdail, in trust for Mrs. Hunt; by a receipt in full from defendant and his wife to Mrs. Hunt and her husband, containing a covenant

on the part of defendant and wife, to indemnify and save harmless Hunt and wife "against all claims against them or either of them, in favor of the estate of Knapp;" and by a quit claim deed from Mrs. Hunt and her husband, to defendant, of the property Mrs. Newbould was to have. The papers all bear date on the sixth of June, but were not executed until the next day, as appears from the certificates of acknowledgment.

In addition to the foregoing facts, the bill states, that defendant took the deed in his own name without the knowledge or consent of his wife, and with a view of wrongfully obtaining her property, she supposing at the time that the deed was taken in her own name; and that defendant had sold a part of the property to different persons, &c.

It also states that Mrs. Newbould, as the widow of Knapp, had a dower interest in a farm, known as the Cook farm, which she had sold for $500 previous to her intermarriage with defendant, and had taken in payment the purchaser's promissory note; that this note was collected by defendant, after their marriage, and that he had not accounted for the money to his wife; and that defendant's wife also had certain personal property (which is named in the bill) at the time of her death, of which defendant retains the possession.

That after the death of Knapp, and before his widow intermarried with defendant, complainant became indebted to his daughter in the sum of $926, 'for which he gave her his note, after her intermarriage with defendant, which note defendant has in his possession; that defendant also holds a note given to him by complainant for $1086.76-100, and that on the 5th September, 1857, defendant brought a suit on the two notes against complainant, in the Circuit Court for Wayne county.

That on the death of Mrs. Newbould, intestate and without issue, complainant became entitled, as heir, to all

her real estate, and to all of her personal estate, as next of kin, under the statute of distributions; and, wishing to avail himself of all the remedies the law gives him, as heir and distributee, for the recovery of the real and personal estate of his late daughter, he had taken out letters of administration on her estate, and in the language of the bill, claims and insists, that, as administrator of the estate, he is entitled to demand and receive all the goods, chattels, credits, choses in action, and effects of whatever nature and description, which were of said Cornelia H. Newbould, during her lifetime, and also such as may have been acquired since her death, which belonged to her said estate; and he also, as heir at law and distributee, claims and insists upon all rights and remedies to which he may be legally entitled, through the said administration or otherwise.

The bill further states, that finding the estate of Knapp had not been settled by his daughter, as administratrix, and that there were claims against it that had not been paid, he had taken out letters of administration *de bonis non* on that estate also, which he claims the right to represent, as well as all rights in the premises to which he may be entitled by law.

The bill waives an answer under oath, and prays defendant may account for and pay over to complainant the proceeds of such parts of the Port Huron property as have been sold by him, and that he convey to complainant what remains unsold; that he pay to complainant the moneys he had received on the note given Mrs. Knapp before their intermarriage for her right of dower in the Cook farm; that he deliver up to complainant the two promisory notes on which he had brought suit in the Circuit Court, and the personal property in his possession that belonged to his wife at the time of her death; with a prayer for an injunction staying the suit at law.

An objection is taken to the bill for multifariousness,

in the answer, which claims the same benefit of the objection as on demurrer.

A bill when multifarious is so for one of two reasons; either because of a misjoinder of parties, complainants or defendants, or a misjoinder of distinct and separate matters of equitable cognizance, between the same parties, of so dissimilar a character as to render it unfit they should be litigated in the same suit.

A and B having separate mortgages against C, can not unite in filing a bill against C to foreclose them, any more than they can unite in a suit at law for the money due on the bonds accompanying their respective mortgages. The reason of the rule is the same in both cases—the want of a joint interest in the subject matter of the suit. Neither can A file a bill against B and C to foreclose separate mortgages given to him by each. The bill in such case would be multifarious for a misjoinder of defendants, as in the previous case for a misjoinder of complainants. Neither will the rules of pleading permit A to unite in one bill the foreclosure of a mortgage, and the specific performance of a contract for the sale of real estate. Such a bill would be multifarious, not for a misjoinder of parties, but of distinct matters of equitable cognizance, which the law will not allow to be united in one suit.

But when a bill contains two separate causes of action, one equitable, the other legal, it will not be treated as multifarious, as the court has but one matter before it to adjudicate, the other belonging to a court of law. — *Knye v. Moore*, 1 *Sim. & Stu.* 61; *Dew v. Clark*, 1 *Sim. & Stu.* 114; *Vurick v. Smith*, 5 *Paige*, 137; *Story's Eq. Pl.* § 283.

I have been led into these general remarks relative to multifariousness by the anomalous character of the complainant's bill. I felt strongly disposed to treat the bill as filed by the complainant in his own right only, and not in both his individual and representative capacity: 1st.

Because the commencement of the bill, the prayer for relief, the prayer for process, the process itself, and the proceedings in the court below, are all in the name of Austin Wales, and not of Austin Wales, administrator, or Austin Wales in his own right and as administrator. Your orator, Austin Wales, complains; not Austin Wales, administrator. Relief is asked to your orator, that is, Austin Wales; and not to your orator Austin Wales as administrator, or to your orator Austin Wales in his own right and as administrator. So with the prayer for process. It is to grant to *your orator* the People's. writ of subpœna, and the subpœna commands defendant to appear and answer to a bill of complaint exhibited against him by *Austin Wales*. The bill, answer, replication, depositions of witnesses, and all the orders entered in the cause with one exception, and the decree dismissing the bill in the court below, are entitled in a cause in which Austin Wales is complainant, and Alexander H. Newbould is defendant. And 2d. Because the only matter stated in the bill, cognizable in equity, is the charge of fraud, in defendant's taking the deed to the Port Huron property in his own name instead of the name of his wife. As to the personal property, and the money received on the dower note, complainant, as administrator, has a clear and adequate remedy at law. He has also, according to his own showing, a good defense at law to the note given by him to his daughter, on which he is sued in the Circuit Court. By proving the note belonged to his daughter at the time of her death, and his administration on her estate, he would show the right to it in himself as her personal representative. The real estate of decedent is differently situated. It belongs to complainant by descent; and if defendant is guilty of the fraud charged, he might, in his own right, file a bill for the proceeds of such parts of it as have been sold, and for a conveyance of the residue.

Neither party, however, took this view of the bill on

the argument. Both parties treated it as a bill filed by complainant in a triple capacity; that is, in his own right, and as administrator on his daughter's estate, and administrator *de bonis non* on the estate of Knapp. In this view of the case, I feel no hesitancy in saying, the bill in my opinion is clearly multifarious, and that the court below was right in dismissing it on that ground.

It will not for a moment be contended, that if A had taken out letters of administration *de bonis non* on the estate of Knapp, and B had administered on the estate of Mrs. Newbould, that A and B could have united with complainant in the present bill. The case is not altered by the fact that complainant is administrator on both of these estates; for each estate is as distinctly and separately represented by him as it would have been had administration been granted to another.

In equity, as at law, individual and representative rights are not allowed to be united in one suit, as it would, as in other cases of multifariousness, lead to all the confusion and uncertainty that would attend the trial of two or more separate causes at the same time, involving different parties, different interests, different pleadings, different defenses, and different testimony, with different questions of law.

The multifariousness of a bill, when there is a misjoinder of complainants, does not consist in the number of complainants, but in defendant being called on to litigate separate matters in different rights in the same suit.

It can not be said complainant in his own right alone is interested in the property of the two estates; for it is stated in the bill, and proved by testimony, that there are outstanding debts against each. But admitting him to be alone interested in the property; that there are no creditors; and that as heir and next of kin he is entitled to what belonged to his daughter at the time of her death — it is no more or better reason for sustaining the present bill, than

9 MICH.—F

it would be at law, for uniting in one action ejectment, trover, and assumpsit for money had and received, to effect the same object.

The answer admits the agreement between Mrs. Hunt and Mrs. Newbould, the execution of the quit claim deed by defendant and his wife to Truesdail, in trust for Mrs. Hunt; and the execution of the deed from Mrs. Hunt and her husband to defendant; and then states that the last mentioned deed was made to the defendant, with the knowledge and at the request of his wife, for the purpose of vesting the title to the land absolutely in defendant as a gift from his wife.

By a statute passed in 1844, the real and personal estate of a married woman, whether acquired by her before or after marriage, with the profits and income thereof, are not to be liable for her husband's debts, engagements or liabilities, but are to continue to be her property to the same extent as before marriage, except that she can not give, grant or sell it during coverture, without the consent of her husband. — *Comp. L. p.* 965. And with the consent of her husband, in writing, she might dispose of it by last will and testament.— *Comp. L. p.* 863.

By our present Constitution, made and adopted in 1850, " the real and personal estate of every female, acquired before marriage, and all property to which she may afterwards become entitled by gift, grant, inheritance or devise, shall be and remain the estate and property of such female, and shall not be liable for the debts, obligations or engagements of her husband, and may be devised or bequeathed by her as if she were unmarried."—*Art.* 16, § 5.

And by an act passed in 1855, such property may be contracted, sold, transferred, mortgaged, conveyed, devised or bequeathed by her, in the same manner and with the like effect as if she were unmarried. And actions may be brought by and against her in relation to such pro-

perty, in the same manner as if she were unmarried. —
*Comp. L. p.* 966.

This last act was passed after the execution of the
deed to defendant, but the only essential difference between
it and the act of 1844, is, it dispenses with the consent
of the husband to a sale of the wife's property by her.

At common law, the personal property of the wife
became her husband's on their marriage, who also thereby
acquired an interest in her real estate, during their joint
lives, with the rights of a tenant by curtesy in case of
issue and the death of the wife in the lifetime of the
husband. These rights of the husband, in the property of
his wife, are taken away by the statute, which gives to
the wife the same rights, in all respects, over her property
after as before marriage. It was so held by this court
in *Starkweather v. Smith*, 6 *Mich.* 377.

In the State of New York there is a similar statute,
differing somewhat from ours, and in *Graham v. Van Wyck,*
14 *Barb.* 531, it was held a married woman could not
convey to her husband her right of dower in his estate.
The decision was made at a special term, held by a single
justice. The court admitted the language of the statute
was broad enough to admit of the conveyance; but, as
by their statute, it was in terms provided the wife should
not take a conveyance of property from her husband, the
court held he should not take by conveyance from her.
Perhaps as it was the wife's right of dower in her hus-
band's estate, that had something to do with the decision.
In a subsequent case, *Vartie v. Underwood*, 18 *Barb.* 561,
the right of a wife to convey to her husband was clearly
recognized. The husband and wife had mortgaged a piece
of property, in which the wife had a separate interest from
her husband. It was afterwards sold, and the surplus
money, after paying the mortgage debt, was brought into
court, where it was claimed by the husband's creditors, on
the ground that, as it was provided in the mortgage in

case of a sale that the surplus should be paid to the husband, the wife had given her interest in the property to him. The court say, "That direction in the mortgage, in reference to the surplus, can scarcely be construed into an agreement between husband and wife, by which the latter transfers, or agrees to transfer, her interest to him for the benefit of his creditors generally."

In *Durfee v. McClurg*, 6 *Mich*. 223, a majority of this court held it competent for a married woman to give her separate property to her husband. The case was this: complainant, her husband uniting with her, assigned a mortgage belonging to her to defendant, and delivered the mortgage and assignment to her husband. The assignment was absolute on its face. Her husband took the mortgage and assignment, and delivered them to defendant, as security for money borrowed of him, and took back a receipt in his own name, showing the nature of the transaction between them. By a subsequent arrangement between them the mortgage was absolutely transferred to defendant. Complainant afterwards filed her bill, stating the assignment by herself and husband was to secure a debt her husband was owing defendant, and that the debt had been paid, and asking to have the mortgage re-assigned to her. The decree of the court below dismissing the bill was affirmed, on the ground that the assignment of the mortgage was absolute on its face, and that there was no evidence showing complainant did not intend by the assignment and the delivery of it and the mortgage to her husband, to give her interest in the mortgage to her husband. The gift was not proved, but implied from the fact that the assignment was absolute on its face, and other circumstances attending the transaction.

In a case in New York, under their statute, more recent than those I have referred to, it was held, that the statute gives to a married woman the same rights over her separate property at law that she previously had in equity.

And where husband and wife lived on a farm, belonging to the latter, which was cultivated by the husband, and there was no evidence of any agreement between them for the use of the farm, the use of it was presumed to be a gift from the wife to her husband, and personal property purchased with the proceeds of the farm was held to belong to the husband and not to the wife. — *Gage v. Dauchy*, 28 *Barb.* 622.

A feme covert is regarded in equity as a feme sole, as to her separate property, which she may dispose of without the consent or concurrence of her trustee, unless specially restricted by the instrument under which it is acquired. *Jaques v. Methodist Church*, 17 *Johns.* 548; *North American Coal Co. v. Dyett*, 7 *Paige*, 9. She may give it to her husband by will, and to enable her to do so it is not necessary the legal estate should be vested in trustees; but an agreement entered into before marriage, with her intended husband, that she should have power to dispose of her real estate, during coverture, will enable her to do so. — *Bradish v. Gibbs*, 3 *Johns. Ch.* 523. And a *bona fide* contract in regard to it, between husband and wife, will be enforced in equity. — *Livingston v. Livingston*, 2 *Johns. Ch.* 537.

In *Jaques v. The Methodist Church*, the power of disposition by a married woman of her separate property was fully considered, and it was held that she might give it to her husband, as well as any other person, if her disposition of it was free, and not the result of flattery, force, or improper treatment, which are not to be presumed. They were not in that case, and I think should in no case be presumed; but, on the contrary, to avoid her conveyance, should be proved, either by direct testimony, or by such surrounding circumstances as would induce a belief of their existence. There are husbands that would not hesitate to resort to improper means to obtain their wife's property, but they are exceptions to the general rule; and if the rule was the

reverse of what it is, would always be found within the pale of the law, panoplied with its formalities.

The object of the statute, it seems to me, is not to disturb the unity of the marriage relation, by requiring husband and wife to keep up a separate interest in their property, but to render it more happy — not so much in shielding the wife against the dishonesty of her husband towards her, which the law never presumes, but the contrary — as by protecting her against his creditors, his business misfortunes, and his follies.

The bill seems to have been framed with reference to some such rule as the one I have stated. It states a case of actual, and not of constructive fraud. A case showing corruption — an evil intent of the heart; not one, although free from the taint of corruption, that the law will not tolerate without some explanation, on account of the facilities it would otherwise afford for covering up actual fraud.

It charges defendant took the title to the Port Huron property in his own name instead of his wife's, without her consent, and contrary to her expectation, and in fraud of her rights. And to sustain the charge states, that the deed to Truesdail, the trustee for Mrs. Hunt, was executed by Mrs. Newbould and defendant at Detroit, and delivered by Mrs. Newbould to defendant to take to Port Huron, which is some sixty miles or thereabouts from Detroit, to be there delivered by him to Truesdail and Mrs. Hunt, in exchange for the deed to be received from Mrs. Hunt and husband, and that defendant, in making the exchange, procured the last mentioned deed to be made to himself. The bill does not state, in express terms, that the deed from Mr. and Mrs. Hunt to defendant was made out at Port Huron; but the legitimate inference to be drawn from its language, and the one that irresistably forces itself on the mind, is, that it was made out at Port Huron after defendant arrived there with the deed executed by himself and wife ; that the deeds were exchanged there,

and that Mrs. Newbould had not an opportunity of seeing or knowing the contents of the deed from Mr. and Mrs. Hunt, when it was executed and delivered.

Now what are the facts? For if the charge be true, it gives a coloring to the case that should be effaced by explanatory evidence, on the part of the defense. It is met and most unequivocally and positively denied by the answer (which, although under oath, as the oath is waived' must be regarded as a pleading only), and is not sustained by a particle of evidence.

The answer states that all of the papers were executed and delivered, at the same time, in the city of Detroit. And of the truth of this statement, in the total absence of evidence to the contrary, I think the deeds themselves, copies of which are annexed to and made a part of the bill, with other surrounding circumstances furnished by the bill, and such geographical facts as the court may take notice of, are ample proof.

Defendant and his wife, and Truesdail the trustee, resided in Detroit, and Mrs. Hunt and her husband at Sandwich, some two or three miles below Detroit, on the opposite or Canadian side of the river. Both deeds are dated on the 6th June; both witnessed by the same persons, one of whom took the acknowledgments of all the parties; and both, as appear from the certificates of acknowledgment, were executed and acknowledged on the 7th June, in the county of Wayne in which Detroit is situated, and not in in the county of St. Clair, in which Port Huron is situated. And it appears from a note of erasures and interlineations at the bottom of the deed from defendant and wife, that the name of David Smart was erased and that of Truesdail inserted as trustee for Mrs. Hunt, after the deed was drawn on the 6th June, and before it was executed on the next day or 7th June. In these facts furnished by the bill — aside from the absurdity of the parties going sixty miles away from home, to Port Huron, to do what

would better be done in the city of Detroit — we have *prima facie* evidence of the oneness of the transaction, and of the presence of all the parties, and of the implied assent, at least, of Mrs. Newbould to the deed to defendant; for it is not to be supposed she was ignorant of the true nature of the transaction. Besides, Mrs. Newbould did not die until the 27th January, 1855, more than a year and a half after the transaction; and yet we have no evidence of any complaint ever made by her to any one in regard to the deed. We can not suppose her ignorant of its true character all of this time, when we take into consideration that there was nothing secret in the transaction, and that what was done was done openly, and in the presence of relatives who knew the real character of the deed, and who were interested in her welfare.

But we are not under the necessity of relying on circumstantial evidence alone to show there was nothing wrong on the part of defendant, even if the law requires explanatory evidence at his hands, which I think it does not. Mr. Davidson, a witness for defendant, says Mrs. Newbould told him repeatedly, in her lifetime, that she had placed the title of the Port Huron property in defendant to make it his. I see nothing improbable in his testimony; he stands before us unimpeached, and as fair as any other witness in the case. And if I did, I should be forced to give credit to his statement, corroborated as I think it is by the circumstances I have stated, one and all of which tend to prove a gift of the property to defendant.

There is nothing in the case showing the improvidence of such an act on the part of Mrs. Newbould. There is no evidence her husband was not in every way worthy of the gift; that he was unkind, or in embarrassed circumstances, or improvident, or that there was aught else threatening to mar their connubial happiness.

The Port Huron property, and the money collected by defendant on the dower note, and used by him as his

own, with his wife's knowledge and without her dissent, I think belong to defendant. The piano, and note for $926 and other personal property, belong to the administrator. I understand Davidson's testimony as referring to the Port Huron property only. The possession of the note is not evidence of a gift. It would not be in any case, without something more; but more especially in the present case, as it is a note given by a father to his daughter, which places it on a somewhat different footing from the note of a third person.

I think the decree of the court below, for the reason I have stated, should be affirmed.

CHRISTIANCY J.:

As to the note of one thousand and eighty six 70-100 dollars, given by complainant to the defendant, we are all agreed the complainant is entitled to no relief.

It is not necessary to determine in this case what would have been the proper decision upon the question of multifariousness, whether relating to subject matter or to parties, had the defendant chosen to risk the result of the objection upon demurrer. He would then have been entitled, not only to whatever might be found substantial in the objection, but to any advantage which might be found in any technical rule upon this subject.

Every ground for this objection appears upon the face of the bill; but the defendant did not see fit to risk his case upon a demurrer: the parties have taken issue upon the facts; testimony has been taken, and they have gone to a hearing upon the merits. Under these circumstances the objection, so far as regards the defendant himself, must, I think, be regarded as entirely waived. Such, upon principle, I think should be the rule, and it is well supported by authority.— *Story's Eq. Pl.* § 284; *Ward v. Cook*, 5 *Mad.* 122; *Whaley v. Dawson*, 2 *Sch. & Lef.* 370, 371; *Nelson v. Hill*, 5 *How.* 127. And see *Abbott v. Johnson*,

32 *N. H.* 9, where the objection was taken by the answer as in the present case, and as the grounds of the objection appeared upon the bill, this rule was held to apply. And the rule applies equally where the objection is the misjoinder of parties complainant.— *Story's Eq. Pl.* § 544.

Doubtless the court may take the objection *sua sponte*, though waived by the defendant; but it could only be justified in doing this where it should be found impracticable, from this cause, to make a proper decree doing justice between the parties; or, perhaps, where it should satisfactorily appear that the defendant has been embarrassed or otherwise prejudiced in his defense. But no one, I think, can fail to see that the defendant has neither been embarrassed nor prejudiced in this case from this cause; nor has the ingenuity of astute counsel been able to suggest any plausible difficulty of this kind. And, unless it shall be found impracticable to render a decree which shall do justice between the parties, it would be wantonly multiplying suits, and would operate oppressively upon both parties, to require a separate suit (if such were practicable) in each of the capacities in which the complainant claims.

I can see no difficulty in this case in making such a decree, and in disposing of the whole controversy *as between the parties before the court.* What this decree should be, will depend, in a great measure, upon the question whether the defendant has sustained his defense by proving a gift of the property to himself. This question I shall discuss in its proper place: but for the present, it is sufficient to say that the bill, answer and proof, independent of the question of gift, show clearly the right of complainant, as heir or distributee, to all the property, subject however to administration on the estate of Mrs. Newbould, and most of it also to administration on the estate of L. Knapp. Complainant's claim, as heir or distributee, is in no respect inconsistent with, but subordinate to, and dependent upon

his claim as administrator. The same may be said of his claim as administrator of Mrs. Newbould in its relation to that of administrator on the Knapp estate; and he is himself the administrator of both estates.

As against complainant, in his capacity of heir or distributee, the gift from the deceased to the defendant, if a valid gift be proved, is a complete bar; but it would constitute no bar as to creditors of the respective estates. The right of the administrator, however, to recover against the defendant might, if the gift be shown, be confined to the amount of such debts, as suggested by my brother Manning, and perhaps to the amount which might have been duly proved in the Probate Court or before commissioners on the respective estates.

But if the defendant has not succeeded in establishing a valid gift of the property to himself, then it was the property of the deceased at the time of her death, and the defendant has shown no right to, or interest in it whatever; while the complainant, in his several capacities, represents the entire title. And, as against one having *no right* in the property, the complainant, as administrator alone, without reference to his individual rights as heir or distributee, is, I think, clearly entitled to the *whole;* and it was unnecessary to have claimed as heir or distributee, though this claim can do no harm, as the decree would be substantially the same.

The administrator is the person by law entitled to the possession, and entrusted with the management of the property, whether real or personal. — *Comp. L.* § 2904. He is required to make and return an inventory of all the property, rights and credits of the deceased, which may come to his knowledge — *Comp. L,* § 2898; for the return of which and for the proper administration of all such property he gives bond to the Judge of Probate — *Comp. L.* §§ 2865, 2880; he is chargeable with the same in his account— *Comp L.* §§ 2977, 2978; and is responsible for the disposition thereof, and

for negligence in collecting the same, &c.— *Comp. L.* §§ 2979 to 2990 inclusive. After the completion of the administration, the payment of debts and expenses, and certain allowances for minor children, the widow, &c., the residue is by a decree of the Probate Court to be dis-tributed to such other persons as are by law entitled thereto.— *Comp. L.* § 2992.

In the hands of the administrator the property is in the custody of the law, and as against him, no other can have a rightful custody.

If the defendant has no rights in the property, it is wholly immaterial to him in which of his various capaci-ties the complainant is entitled to it, or whether in all, or how much of it in one and how much in another, so that complainant shows a right to the property in any or all the capacities in which he claims, and so that the decree shall fully protect the defendant from all liability to account again for the property. Nor is it necessary for the court, under such circumstances, to determine how much of it belongs, or may ultimately be found to belong, to the one estate and how much to the other, nor what shall ' be the amount of the residue for distribution, nor to whom it shall be distributed. These are questions which the Probate Courts, in which the estates are to be administered, are fully competent to decide.

It would be extremely unwise, and would lead to inex-tricable confusion, for the Court of Chancery, even if it had the power, thus to take the administration. of the estates out of the hands of the Probate Courts where they are now pending. But I am by no means prepared to admit that the Court of Chancery has any such power under our system.

It is sufficient for this court to determine the questions in controversy between the parties before it, without under-taking to follow this property into the hands of all those who may eventually become entitled to it in the course

of administration, or by descent, purchase, or otherwise.

If, then, no valid gift has been shown, the property in the defendant's hands (with the exceptions to be hereafter specified) must, I think, be considered as having been obtained by a constructive fraud — *Story's Eq. Jur.* §§ 187, 259, 313 to 315; *Hill on Trustees* 159, 160; and to constitute a trust in the defendant's hands, for which he is liable in equity to account to the complainant who represents the rights of the deceased. The laws of the land will attach to the property in complainant's hands, and the courts of Probate, where all questions touching its administration and distribution properly belong, will administer the law. All this court can properly do, in the present case, is to enforce the account, and to place the property in the hands of the complainant, subject to administration on the respective estates, in the proper Probate Court, so far as the same may, by law, be liable to such administration, and the residue to be distributed in that court according to law.

This decree will end the controversy between the parties before the court, and, when complied with, will exonerate the defendant from all liability to either estate, to the complainant and to all other persons, and from all liability upon his indemnity to Mrs. Hunt. And to this decree I think the complainant is entitled, unless it shall be found that a valid gift has been shown.

But it is urged that the complainant, as administrator of the Knapp estate, has no right to call upon the defendant in a court of equity for the proceeds of the lands obtained under the compromise with Mrs. Hunt; because that compromise was void as against the administrator, and he has a remedy at law by selling the land itself—as well that released to Mrs. Hunt as that conveyed to defendant — as if no compromise had been made.

This objection comes with an ill grace from the defendant, who was a party to the compromise, who took the

title to himself, has sold the land to others and received the proceeds. *He* is not entitled to insist upon this objection. But if it appeared in the case that the debts against the Knapp estate were so large as probably to exhaust the whole property, and that the lands had been sold for less than their value, it might raise a serious question (which the court might be bound to notice) whether the administrator could waive his right against the land itself, and elect to take the proceeds.

But the defendant denies that the debts against that estate exceed twenty - five dollars; and all that the proof is claimed to show is some five hundred and fifty dollars; and, from the length of time which has elapsed, there is no probability that there can be any others — if in fact all others are not barred by the statute. This amount, compared with the whole proceeds of the property, is very small; and there does not appear to be the remotest probability, if indeed a possibility, .that the whole can be required for the payment of debts. On the other hand there is nothing in the case to indicate a suspicion that the lands have been sold by the defendant for less than their real value, nor any probability that .such is the fact. On the contrary, having been at liberty to take advantage of the market, without being restricted to a public sale at a particular time and place, as an administrator must have been, the probability is that he has sold them to a better advantage than an administrator could have done.

Under these circumstances, though the administrator might have a strict legal right to resort to the lands instead of the proceeds, yet it would be unjust and inequitable in the extreme to disturb the compromise after the lands have passed into other hands, and would be likely to lead to much useless litigation. It would therefore be violating the plainest principles of equity, for the court to refuse the claim for the proceeds upon this ground.

But, it is objected that, as to the note of nine hundred

and twenty-six dollars given by complainant to Mrs. New-bould, and the piano and other specific articles of personal property, the Court of Chancery has no jurisdiction, as there is a complete remedy at law. As to the note, it is said that by proving it to have been hers at the time of her death, and that complainant was her administrator, he would establish a full defense in the suit at law. Whether this defense could be rendered available, in the action at law against him individually, under all the circumstances, I shall not stop to inquire, because a full defense on his part in the action at law does not constitute a full and adequate remedy. As administrator on the estate of Mrs. Newbould, he is entitled to the note itself. — *Story's Eq. Jur.* § 703.

But, as relates to the specific articles of personal property, the piano, paintings, &c., which seem to have been left in the defendant's hands only by the death of his wife, and not obtained by him through any agency or special confidence, I think there is a complete and adequate remedy at law, by an action of replevin or trover; and if any discovery were required, the statute gives to the complainant a full and adequate remedy for such discovery in the Probate Court; — *Comp. L.* §§ 2905, 2906; though it seems to give no power to enforce the delivery of the property or writings of which the discovery may be there enforced. I do not think the jurisdiction of equity can be maintained in respect to this property, on the ground of discovery alone, as the oath of the defendant is waived; nor consequently on the ground of any relief which might be merely incidental to such discovery. — *Comp. L.* § 3485. Nor will equity maintain a bill for the delivery of specific articles, except upon peculiar grounds, not stated in this bill: nor do I think the bill in respect to this property can be maintained on the ground of an account merely. In fact I can see no ground upon which the rights of the parties in respect to this personal property could be litigated in a court of

equity; and if the defendant had set up any claim to it, or had disputed the title of the complainant, I should have been compelled to hold that no relief could be given to complainant in respect to this property in this suit. But as the complainant's title to this property is not disputed, and the defendant has claimed no interest in it, there would seem, upon general principles, to be no good reason why the complainant should be turned around to a suit at law for its recovery. But I have had some doubts upon the question of the jurisdiction of equity to enforce its delivery, and these doubts are not entirely removed; though I am inclined to the opinion that the jurisdiction may be maintained; and I therefore concur in the result upon this point with the Chief Justice.

I proceed now to inquire whether the defendant has succeeded in establishing a valid gift. This being set up by the defendant, and constituting in fact his sole defense, the burden of proof is upon him to establish the gift. His answer (the oath being waived), is but a pleading, and the question must be decided by the evidence alone. And if, previous to and at the time when the gift is claimed to have been made, the defendant stood in the relation of an agent to his wife, or any position of trust and confidence in relation to this property calculated to make her disregard the dictates of ordinary prudence, and to omit that circumspection and those safeguards usual in dealing with others, and to trust the management of her property and her interests to him; then he stood in a position which the law recognizes as peculiarly liable to abuse, and which, of itself, casts suspicion upon any purchase he might make or gift he might receive from her during the continuance of that confidential relation; and, therefore, in such case, it will not be enough for him to show a formal gift, but he must also show affirmatively the fairness of the whole transaction; that there was no undue influence, misrepresentation or imposition; in short, that the confidence reposed in him has not

been abused. If he does not do this, the property will be considered as having been obtained by a constructive fraud. *Welles v. Middleton*, 1 *Cox*, 112; *Gibson v. Jeyes*, 6 *Ves.* 278; *Ormond v. Hutchinson*, 13 *Ves.* 51, 52, 53; *Story's Eq. Jur.* §§ 307 to 316; *Id.* § 187; *Hill on Trustees*, 159, 160.

Now, as far as the Port Huron property is concerned, it is, I think, clear, as well from the nature of the transaction, as from the direct testimony of E. A. Wales and Mr. Backus, that, in the making of the compromise, the defendant was acting as the agent of his wife. She was not present, but remained at Detroit while this arrangement was made at Port Huron. By this arrangement, which constituted the compromise, the property was to be conveyed to Mrs. Newbould in fee. The deed however, when subsequently made, is found to have been made to the defendant, and not to his wife. When the arrangement was made by which the deed was to be given, E. A. Wales, her brother and her counsel, was present; but he does not appear to have been present when the deed was made, or to have known that it was made to the husband. Nor does it appear that the person who drew the deed, nor those who certified this or the other deed, nor the officer before whom both were acknowledged, knew why the deed was made to the husband, instead of the wife. Prima facie, at least, under such circumstances, the deed made to the husband must be held to have been in trust for the benefit of the wife. And, under all these circumstances, it is not too much to say that, to establish this conveyance as a gift, the evidence should be above all suspicion, clear and satisfactory. As the deed was to have been made to Mrs. Newbould, and she, and not her husband was the person in whose right it was obtained, it is but reasonable and natural to infer, that if she intended this conveyance from other parties as a gift from her to her husband, she would have manifested that intent at

the time, either by some instrument in writing (which was the most obvious way) or by instructions to the person who drew the deed, or, if she was present when the deed was executed, that she would have declared the intent to the witnesses or to the officer who took the acknowledgment, or to some other person cognizant of the transaction (and if not present no inference can be drawn against her from its execution), or that she would have taken some means at the time to show at least that she was aware of the fact that the deed was being made to her husband and not to herself. If she is to be supposed to have known the legal effect of the transaction, she must be supposed to have known that, if it were left to stand upon the deed alone to which she was not a party, without anything to show her assent, it would constitute a trust to herself and not a gift to her husband.

The fact, that the defendant has not seen fit to call the person who drew either of the deeds, nor the witnesses to either, nor the person before whom they were acknowledged, nor any other person who participated in any part of the transaction, or was cognizant of it, or likely to have any personal knowledge of the facts; that he has not attempted to show why they were not called; that he relies solely upon evidence of casual conversations purporting to have been held by her without any apparent object, with a citizen of Albany, only occasionally in the state, who knew nothing of the transaction itself, and this after (it does not appear how long after) the transaction was completed — these facts, in connection with the nature of the transaction itself, and the defendant's confidential relation, though not absolutely conclusive against the idea of a gift, must at least be held to cast a very perceptible shade of suspicion upon this defense.

No species of testimony is more easily fabricated than that of admissions or declarations like those testified to by Davidson: and the value of such evidence — especially when

we are compelled to judge of it by written deposition, without seeing or hearing the witness himself—must always depend much upon the nature and circumstances of the case, and much also upon the facilities which it affords for contradiction, if false. Here the party whose declarations purport to be given was dead before the testimony was taken, and can therefore neither contradict nor explain, nor afford to others any means of explanation or contradiction, however easily her knowledge of the facts might have enabled her to do so, if alive. This consideration, as it takes away much of the substantial benefit of a cross-examination, should make us still more cautious of giving implicit credit to the testimony.

But independent of all the grounds of suspicion already enumerated, the matter of the testimony itself does not appear to me to be such as to command implicit belief. It discloses no special reason why the statements should have been made to him more than to any other person of her acquaintance. The language of her conversation, in reference to the gift, strikes me as more full and formal than would ordinarily be used by a woman under such circumstances, and resembles quite as much the formal language of a legal instrument, or a pleading in chancery, as that of ordinary conversation. The language comes as fully up to the requirements of the whole case, legal inferences and all, as if it had been a formal declaration, or admission made with express reference to the pending litigation. But, while it shows no very satisfactory reason why so formal a statement should have been made to him at any time, it entirely fails to show or to suggest any reason whatever why she should have held the same conversation with him and told him the same thing " *twenty times*" over, and (as I understand the testimony) on as many different occasions. Does not this look like an attempt to add force and emphasis to the testimony? and, as such, does it not, in fact, tend to weaken it? Are we to sup-

pose, for instance, that after she had already told him the the same story nineteen times, she had forgotten she had ever told him at all? or that she supposed he had forgotten it, or did not believe it? If this testimony be true it would seem to indicate that she was in the habit of talking a great deal and remembering very little: and yet he says, "she was not in the habit of talking much." Does it add anything to the probability of the testimony that no one was present at any of these repeated conversations, except the deceased and the witness himself? He does not intimate that these things were told him as a secret to be confidentially kept, nor that she wished him to be the special witness for the proof of the facts. But he thinks she never told him these things in the presence of her husband, nor can he give any instance in which any of these conversations took place in the presence of any one else. It is therefore impossible to contradict him, if false, especially as he is very indefinite as to time, and she is long since dead. He says the conversations were introduced by talking about defendant's affairs, and about his own. If he was as communicative as he represents her to have been, and repeated over the same full statement of his own affairs to her as often as he represents her to have repeated that of her own to him, it would seem that these private sessions must have been pretty exclusively confined to the discussion of business affairs: and yet no special reason is given why she should be particularly interested in his affairs, or he in hers; and all these business discussions, so far as appears, were without any adequate object. True he says he "knew her and was intimate with her and her family"—still he does not seem to have been so intimate with her as with her husband. He calls his intimacy with the defendant an "extreme intimacy," says it was even greater than with his own brothers, and that he told the defendant of these conversations with his wife during her life.

Granting that it may be usual or customary for a

WALES v. NEWBOULD.

business man to be discussing his own business affairs and those of his intimate friend with the wife of that friend, in the absence of her husband and of every body else, and then communicating to the husband what she had said — which may sometimes happen, though it should not be customary — still I can not but think it somewhat extraordinary, that those discussions should always bring up the same transaction, and elicit the same declarations on twenty different occasions, and that without any apparent object, and when the declarations, according to the testimony, do not appear to have been a subject of doubt or dispute.

I do not mean to say that any of the features of this testimony which I have noticed, or all of them combined, are at all conclusive of the question of their truth or falsehood. I may have attributed to them too much significance. But I have endeavored to present them exactly as they have operated upon my own mind. The testimony *may* all be true. But it can not be denied that it has many of the ear marks which we should expect to find in testimony fabricated for the occasion. And I can only say that it does not appear to me to be such clear, unsuspicious and satisfactory testimony as the nature of this case requires to establish the gift, and that it has failed to produce upon my mind a conviction of its truth. And I can not resist the conclusion that, to establish a gift from a wife to her husband by such testimony, in a case like the present, would in many cases be practically equivalent to a repeal of the statute which secures to the wife her separate property.

I must therefore concur in the result with the Chief Justice, and the decree must be entered according to the directions contained in his opinion.

CAMPBELL J., did not sit in this case, having been of counsel.