PAYNE *v.* AVERY.

# Chauncey S. Payne v. Charles P. Avery et al.

*Attorney at law: Professional duty.* An attorney at law, who assumes the double position of purchaser and confidential legal adviser, is bound to observe the utmost good faith towards the party with whom he is dealing; and to draft all papers with sufficient care and professional skill, so as to make them express the real understanding and agreement of the parties.

*Equity pleading and practice: Multifariousness: Demurrer reserved to the hearing.* When defendants in Chancery desire to take advantage of multifariousness, the proper practice is to demur. But if they reserve the privilege of making the objection at the hearing, when the expenses of taking proofs have been incurred, and the Court put to the trouble of a full discussion of the case, they cannot complain if their objection be disregarded. At that stage of the case, it is for the Court and not the party to take advantage of multifariousness; and unless the nature of the case be such that justice cannot be done upon the pleadings and evidence as then presented, the demurrer at the hearing will be overruled.—*Wales v. Newbould, 9 Mich., 81.*

*Foreclosure bill: Allegata et probata.* On a bill filed for the foreclosure of a mortgage, it is not competent for the Court to direct a partition of the premises, even though the facts proved might make such a partition equitable between the parties. A court of equity can only do justice with reference to the allegations of the bill and the relief prayed for.

*Equitable mortgage: Vendor's lien.* P contracted to sell to A the undivided half of a tract of land at a price specified in the contract, and by the same contract A agreed to render his personal services in the care, management and sale of the land. P conveyed to A the land in pursuance of the contract, taking back a mortgage to secure its performance. A having failed to perform on his part, P files a bill to foreclose the mortgage and claims an equitable lien upon his interest in the land, not only for the value of the services which were not rendered, as required by the contract, but for the amount of a deduction from the real value of the interest sold to A, made as a special inducement to A to enter into the contract:—

HELD, that the considerations moving P to contract with A were of such a nature as to present an inherent difficulty in the attempt to estimate the pecuniary damage to P,—and whether or not P would have a remedy at law for damages occasioned by the breach of contract, they are of a character too uncertain to constitute the subject of an equitable mortgage, or a vendor's lien.—*Campbell v. Campbell, supra p. 433.*

*Mortgage sale: Successive incumbrancers: Notice: Record: Order of sale.* The subsequent grantees or incumbrancers of mortgaged premises have a right to rely upon the record as determining the amount of the mortgagee's claim. They will not be charged with notice of the conditions of the bond, to which the mortgage is collateral, but which are not expressed in the mortgage; though these of course will determine the rights existing between mortgagor and mortgagee; and they will also be entitled to presume that payments, made to the mortgagor, are applied upon the mortgage as it appears of record. Taxes paid by the mortgagee, which should be paid by the mortgagor, may be added to increase the charge upon the mortgaged premises. The decree will direct a sale, if a sale shall be necessary, in the inverse order of alienation.

*Computation of interest.* When a payment of principal is not equal to the interest due at the time the payment is made, the interest is to be computed to the·

time when the payment shall bo equal to all the accrued interest; or if there has been no such payment, then to the time of liquidation.

*Heard October 7, 8.   Decided October 18.*

Appeal in Chancery from Genesee Circuit.

The bill in this case was filed in the Circuit Court for the County of Genesee in Chancery, to foreclose a mortgage given, by the defendant Avery to Payne, to secure the payment of the purchase price of the property described in the mortgage. The bond accompanying the mortgage contained conditions not set forth in the latter; and their execution and delivery were preceded by negotiations and contracts between the parties, by which Avery undertook to act as a general agent in the care and sale of the mortgaged property, which contracts the complainant alleged that Avery had not performed. Henry H. Crapo, Zacheus Chase, Lucy A. Chase, James C. Wilson, Almon Reynolds, Mary Fellows, James Collins, Thomas Cole, The Garland Street Methodist Episcopal Church, The Flint & Pere Marquette Railway Company, and the Mayor, Recorder and Aldermen of the City of Flint, were made parties as subsequent grantees or mortgagees.

The Flint & Pere Marquette Railway Company answered separately. Henry H. Crapo, Zacheus Chase and Lucy A. Chase united in a joint and several answer, and the remaining defendants united in a joint and several answer. Replications were filed to each, and testimony taken; which, with the copies of the exhibits, occupy one hundred and twenty-nine pages of the printed record.

The hearing of the cause was submitted by stipulation to the Hon. Sanford M. Green, whose decision, it was provided, should have the same effect as if entered on a hearing of the cause on pleadings and proofs.

The decree entered upon the determination of the referee provided that Payne and. Avery should each release

to the other certain specified portions of the mortgaged property; and that each should procure to be released all incumbrances, liens or outstanding titles created by each since the commencement of this suit, and that such conveyances, releases and discharges, when executed and delivered, should operate as a full payment and satisfaction of the mortgage, and a partition of all property embraced in it.

The complainant, Payne, and the Flint & Pere Marquette Railway Company appeal from the decree to this Court.

*L. Walker, Wm. Newton* and *G. V. N. Lothrop,* for complainant.

*W. L. Webber,* for the Flint & Pere Marquette Railway Company.

*C. P. Avery* and *C. I. Walker,* for the other defendants.

COOLEY, J.

The bill in this cause sets forth that on January 23, 1856, complainant was seized and possessed in fee simple of a large quantity of land, situated in and adjacent to the city of Flint, which land was what remained unsold of a still larger quantity formerly owned by him, and from which he had made many sales, leaving at that time belonging to him about six hundred acres; that a part of this had been surveyed and platted into lots for building purposes, while another part was valuable for agricultural purposes; that some of the building lots had been built upon and the buildings rented, and some of the agricultural lands cleared, fenced and made productive; that being desirous of selling such lands and turning the same into money, and at the same time of being relieved of the

care and trouble and anxiety of managing and looking after it until it should be sold, and also of selling it, and of the care and trouble of looking after and managing his property and business generally, he entered into an arrangement and agreement with the defendant, Charles P. Avery, then of Owego, New York, substantially as follows:

That complainant and his wife should convey to said Avery the one undivided half of all the said lands remaining unsold, excepting therefrom his homestead and a block on which a church was situate, for the sum of twenty-five thousand dollars, to be paid out of the proceeds of the sale thereof as fast as sales should be made, either in money or securities received therefor; that said Avery should soon remove to Flint, and enter upon the business of selling and disposing of said lands, as well as complainant's interest therein, as his own, and should also take charge of and do complainant's business connected with said real estate, and also aid as attorney and counsel in the defense of certain ejectment suits then pending for portions of said lands, and take charge generally of complainant's business as required, without charge, and in as short a time as possible pay off said twenty-five thousand dollars; that inasmuch as some of said real estate was productive, it was further agreed that Avery should pay complainant annual interest from that time on the value of the productive portion, and should pay annual interest upon the remainder so fast as the same or any part thereof should be made productive, by sale or otherwise; and in case Avery should retain in his own hands any of the moneys or securities received on sales, he should pay annual interest thereon to complainant until the same should be paid or delivered over; that whenever any of the productive property should be sold, and the proceeds of Avery's half thereof paid over to complainant, interest

should cease on a sum equal to the amount so paid over, and Avery should thereafter pay interest on the value of so much as should remain unsold; that the payment of said twenty-five thousand dollars should be secured by the bond of said Avery and a mortgage on the undivided half of said lands so sold him, and that there should be no partition or division of said lands between the said parties.

The bill further avers that Avery was a lawyer by profession; that complainant had but recently become acquainted with him, having first seen him in December, 1855; that Avery saw and examined the lands, and was fully informed of complainant's purpose in making sale; that a schedule was made of the lands during the negotiations which led to such arrangement, and each lot valued, and that the whole land, one half of which was sold to Avery, was then estimated at a low figure at twenty-five thousand dollars; that one undivided half thereof was well worth thirty-five thousand dollars, which was then well known to Avery, and that complainant's object in making the arrangement was to make Avery interested in the lands in common with complainant, and to secure his services as aforesaid without further charge, and to fully compensate him in the trade for his services so to be rendered; all of which was explained to, and fully understood and assented to, by said Avery; that from the previous recommendations complainant had had of Avery, he had come to consider and believe him a man of integrity and ability, fully competent to transact the business and perform the services required, and so substantially informed said Avery, and that complainant stated to him in substance that he had become satisfied with him, and had come to regard him as taking an interest in complainant's business, and was willing to consummate the arrangement with him, and in preparing the necessary contracts and conveyances,

should confide all things to him, said Avery, believing that he would see to it that complainant's rights and interests were fully secured and protected; and he should neither employ nor consult any other counsel, but rely upon him alone; and that Avery assured complainant that he would at all times deal honestly and fairly with him, and in conducting the business of complainant, whether with himself or others, would look after and protect complainant's interests.

The bill avers further, that on the 22d or 23d of January, 1856, complainant and Avery went together to Detroit, at which place Avery drew and the parties executed in duplicate what Avery called the skeleton of an agreement, and which is as follows:

"This Agreement Witnesseth that Chauncey S. Payne of Flint, Michigan, has agreed to sell, and Charles P. Avery, now of the same place, but lately of Owego, New York, has agreed to purchase, the one undivided moiety of all the unsold portions of sections two, three and four, being a portion of Smith's Reservation at the Grand Traverse, so called, on Flint river, with the exception of blocks 30, 31, 48 and 49, containing about eight acres, being his homestead, the said undivided moiety amounting to three hundred acres or thereabouts, and being the same premises now occupied or claimed by the said Payne. The said Payne for himself, his executors, administrators and heirs, hereby agrees to convey such undivided moiety or half to the said Charles P. Avery, his heirs and assigns, whenever the latter shall desire, such conveyance to be made upon his return from the state of New York, such conveyance to be duly executed by said Payne and wife, and thereupon the said Charles P. Avery hereby agrees to execute and deliver to said Payne a mortgage upon the said premises, accompanied by his bond in the usual form, for the sum of twenty-five thousand dollars,

21 MICH.—C3.

payable out of the proceeds of the sales of said undivided moiety, that is to say, as follows: Two-thirds, or such other proportion, as said Avery may find convenient and practicable of the proceeds of said sales, if the same be in the form of judicious and safe securities or cash to be delivered over to the said Payne by the said Avery, to be endorsed on the said mortgage, and to go thus far in liquidation and satisfaction of said mortgage; said mortgage to be given without interest, whatever interest may accrue upon such securities, while in the hands of said Avery, before delivery of the same to the said Payne, and seven per cent upon the cash proceeds before the same is paid to said Payne to be allowed to said Payne as equitable interest upon the same amount of the principal of said mortgage. It is understood that said Avery is to manage the other moiety of said premises belonging to said Payne for him on his behalf, in making sales and general attendance to the same without charge. In case the said Payne should leave home and desire the said Avery to collect and receive moneys upon his mortgages and other securities, and to attend to his general business during such absence, said Avery is to comply with such desire and transact such business without charge. In case of a failure of said Avery to return to the state of Michigan to comply with this agreement within sixty days herefrom this agreement to be wholly inoperative and void, and to have no effect for any purpose, leaving no right of action to said Avery's representatives against said Payne.

"Witness our hands and seals this 23d January, 1856.

"C. S. PAYNE.       [Seal.]
"CHARLES P. AVERY.   [Seal.]"

The bill further avers that previous to the drawing of this agreement, nothing had been said respecting the delivery to complainant of two-thirds or any other proportion

less than the whole of the proceeds of the sales of said undivided half of said lands so to be deeded to Avery, and that Avery, when he read that clause in the agreement, stated that he inserted the provision for the particular benefit of complainant and as his security in case of the death of Avery; that on hearing it read complainant did not notice the words, " or such portion as said Avery may find convenient and practicable," and does not believe those words were read to him, and did not know that they were in the contract until long afterwards, and that in other respects the writing did not fully express the understanding of the parties, but it was then understood and agreed that whenever at any time there should be found any error, mistake, or insufficiency in the written contract, or that it did not practically carry out the intentions of the parties, it should be corrected and made to conform to their true understanding and agreement; and the complainant alleges that the ten thousand dollars, the difference between the sum to be paid to complainant and the low estimate of thirty-five thousand dollars put upon the undivided half of said lands conveyed to Avery, was allowed and given to Avery and accepted by him as the consideration for the agreement of Avery to manage the other undivided moiety of said premises for complainant in making sales and general attendance to the same without charge, and in case complainant should leave home and desire said Avery to collect or receive moneys upon his mortgages and other securities and attend to his general business during such absence, to comply with such desire and transact such business without charge.

The bill further avers that after the execution and delivery of the said written contract as aforesaid, Avery left for the state of New York, and returned to Flint on or about the eighteenth day of February, 1856, and soon after-

wards prepared a deed in fee simple, with covenants of seisin, against encumbrances and of warranty, of the undivided half of said premises to said Avery, and the same was executed and acknowledged by complainant and his wife and delivered to Avery in fulfillment of the said agreement on the part of complainant; that Avery at the same time prepared, executed, and delivered to complainant his bond in the penal sum of fifty thousand dollars, conditioned in substance according to complainant's recollection and belief for the payment to complainant of the sum of twenty-five thousand dollars out of the proceeds of the sales of the lands described in the mortgage accompanying said bond, that is to say, two-thirds at least of said proceeds to be delivered to complainant, said Avery to be charged with interest on all securities and cash remaining in his hands before delivery to complainant, which bond was afterwards handed by complainant to said Avery for the purpose of being corrected by him in some particulars, and was not returned to complainant, but in lieu thereof said Avery afterwards delivered to complainant another bond by himself, which is as follows:

"KNOW ALL MEN BY THESE PRESENTS, That I, Charles P. Avery am held and firmly bound unto Chauncey S. Payne, in the sum of Fifty Thousand Dollars lawful money of the United States of America to be paid by the said Charles P. Avery, his certain attorneys, executors, administrators or assigns, to which payment well and truly to be made, I bind myself, my heirs, executors and administrators, firmly by these presents. Sealed with my seal and dated this 19th day of February, 1856. The condition of this obligation is such that if the above bounden Charles P. Avery, his heirs, executors or administrators shall pay or cause to be paid to the said Chauncey S. Payne, his executors, administrators or assigns the just and full sum

of Twenty-Five Thousand Dollars out of the proceeds of the sales of the lands covered by the mortgage accompanying this bond, that is to say, as follows: One half of the said proceeds, whether the same be in cash or securities to be delivered over to said Payne his executors, administrators or assigns, to be endorsed as payments on this bond, said Avery to be charged with interest upon all securities while they remain in his hands, before delivery of the same to said Payne, and seven per cent. interest upon the cash proceeds which so remain in his hands, to be paid as above provided, out of said proceeds. In the taking of such securities said Avery is to exercise ordinary prudence and none shall be considered as endorsable hereon, unless they have been taken upon sales fairly made and in good faith. It being also understood and agreed that the sum of Five Hundred and Sixty Dollars each and every year, until this bond is fully paid (that sum being the estimated value of the yearly rents and income of the productive property embraced in said mortgage) is to be added to the principal of this Bond to be paid as above provided with interest on said sum of $560 00 to be computed from the first day of April of each year, commencing with April 1, 1857, but in case of sale of said Avery's interest in any of the productive property aforesaid a deduction is to be thereupon made from the said Five Hundred and Sixty Dollars, of an amount equal to the annual interest on such sale, and thereafter the balance only after such deduction is to be carried to said principal and paid as above provided with interest on such balance, upon the performance hereof, then this obligation to be void, or else to remain in full force and virtue.

" CHARLES P. AVERY. [Seal.] "

To secure the payment of the moneys mentioned in this bond, Avery, on the same day, executed a mortgage

on the undivided half of the premises so conveyed to him, the condition of which was that Avery should pay to complainant "the sum of twenty-five thousand dollars according to a certain bond bearing even date herewith, executed by the said C. P. Avery as a collateral security;" which mortgage was duly acknowledged, and afterwards, on the 8th day of June 1857, recorded in the office of the Register of Deeds for the county of Genesee.

The bill proceeds to state that after these papers were executed, and in 1856 or 1857, complainant and Avery caused a portion of the said lands to be surveyed and platted and laid out into building lots for sale; that soon after the making of said deed, bond and mortgage, Avery, in pursuance of the agreement, entered upon the business of looking after and making market for said lands, and sales were made in parcels from time to time until the 30th day of April, 1857, complainant and Avery agreeing upon the price of each parcel, and executing deeds jointly except in a few cases, in which contracts only were given; that the consideration of the sales made up to the 30th day of April, 1857, amounted in the aggregate to about the sum of fourteen thousand dollars, and complainant had received from Avery $2,714 49, to be endorsed and applied as part payment on said bond; that on September 3, 1857, another parcel was sold by complainant in the absence of Avery for $237 50, and a deed given by both therefor, it not having occurred to complainant up to that time that by joining with Avery in deeds of the parcels sold, he discharged the lien of his mortgage; but soon after that date, having learned that Avery construed the condition of the bond to mean something different from what complainant understood it, and different from the meaning which it ought to have been made to express according to the understanding and agreement between the

parties, he submitted the same to counsel, by whom he was advised that by joining with Avery in a deed of a parcel, he discharged Avery's undivided half thereof from the lien of said mortgage, which was different from the expectation and intention of the complainant.

The bill further states the sale of another small parcel of the land in May, 1858, and the payment by Avery to complainant of small sums on the mortgage amounting in the aggregate to about $451; that aside from these and the other payments mentioned, the mortgage is now unpaid and owing to complainant; that in June, 1857, Avery, without the consent of complainant, ceased to manage for him complainant's half of the lands, and has not since resumed such management, but neglected and refused so to do; that in May, 1859, Avery filed his bill against complainant for a partition of said lands, and obtained a decree to that effect, which, however, was subsequently reversed in the Supreme Court in October, 1864; that during the pendency of such suit, no sales were made of said lands to the knowledge of complainant, except that each of the parties gave to the Garland Street Methodist Church deeds of an undivided half of a certain parcel described, in payment of subscriptions of $450, made by each to such church, and Avery at different times, particularly specified, conveyed other parcels to Lucy A. Chase, the Flint and Pere Marquette Railway Company, Oliver Prescott, Henry H. Crapo, and the Mayor, Recorder and Aldermen of the city of Flint, and has mortgaged another parcel to James C. Wilson.

The bill then proceeds to describe in detail the several parcels of land embraced in Avery's mortgage which still remain unsold and subject to the lien thereof; avers that complainant has frequently called upon Avery for payment of the amount of the bond and mortgage, but with-

out avail; that he has frequently, and especially since the termination of the partition suit, called upon and requested Avery to proceed and make sales of said lands for the payment of the amount owing by him, and offered to fix with him upon a schedule of prices and other terms upon which the land might be offered for sale, the proceeds of the Avery half to be applied on the bond and mortgage, but Avery would only do so on the terms of retaining in his own hands one-half of the proceeds of his moiety, and purchasers would not take deeds unless complainant would release the parcels sold from the lien of his mortgage, which he declined to do unless he received the whole proceeds, and thus sales have been prevented; that complainant is willing and desirous that the lands should be turned into money or interest-bearing securities within the shortest possible time; which fact Avery well knows, but that if the whole of the land should be sold and complainant discharge the lien of his mortgage upon the same on receiving one-half the proceeds of Avery's undivided half, his security would be gone without full payment of the amount owing to him; that Avery is in the receipt of rents and profits from said lands for which he renders no account to complainant, and has cut and sold off a large quantity of timber from the same without accounting therefor; that Avery has sometimes neglected to pay the taxes on his undivided moiety, and complainant has been obliged to pay large sums, amounting in all to $800, to protect the lien of his mortgage; that necessary repairs and valuable improvements have been made by complainant upon such lands, at a cost of $2,000, for which Avery has not accounted with him, but should account and pay one-half thereof.

The bill then proceeds to state that certain mortgage claims which were held by complainant on different parcels,

when the deed to Avery was given, and subject to which the deed was given, are still owing and unpaid; repeats at length and with considerable particularity the willingness and anxiety of complainant to have sales made and Avery's refusal to proceed to make them except on the inadmissible terms before mentioned; makes the several grantees of Avery above mentioned, and also Zacheus Chase, Almon Reynolds, Mary Fellows, James Collins and Thomas Cole, parties defendant, as subsequent purchasers, encumbrancers or otherwise; prays for an account from Avery touching the amount due upon the bond and mortgage, and touching the rents, profits and income of the lands received by Avery, and the waste committed upon and timber sold from the same by Avery, and touching the improvements and repairs made by complainant, and the taxes on Avery's moiety paid by him; and also the claim of complainant for the non-performance by Avery of the services, which, according to the arrangement and agreement, were to be performed by him for complainant; and that for the amount found due, a decree of foreclosure and sale be entered, or, if it shall be found by the Court that the amount of Avery's indebtedness to complainant is not yet due, then that the rights of the parties may be declared by the Court, and the time when the moneys shall come due be fixed, and decree be made for the payment of the same as so fixed.

We have been thus particular in giving a very full abstract of the material parts of the bill, because, though the defendants answered fully to the merits, yet as they claimed the benefit of a demurrer by their answer, they now insist upon this claim, and that the bill should be dismissed as multifarious, because it unites with a claim in which all the defendants are interested, separate equitable claims against Avery in which the others have no interest, and which are wholly unconnected with the claim against

21 MICH.—P³.

them. It is not denied that the defendants are all proper parties to a bill to foreclose the mortgage for the non-payment of the twenty-five thousand dollars mentioned therein; but an account regarding the non-performance of services by Avery, or waste committed, timber sold, rents and profits received or taxes left unpaid by him, is something, it is said, in which the other defendants are in no way concerned; and as such account would constitute the proper ground for a separate suit in equity, it could not properly be made the subject matter of relief in the present suit, and parties not interested therein put to the expense of a litigation concerning it.

Where advantage of multifariousness is desired to be taken by defendants, the desirable practice is, for them to present the objection by demurrer, that the Court may pass upon it before the expense of reference and testimony is incurred. If, instead of taking this course, they only by their answer reserve the privilege of making the objection at the hearing, when the expenses are already incurred, and when the Court is put to the trouble of a full discussion of the case, they cannot complain if the Court disregards their objection, unless the nature of the case is such that justice cannot be done to the parties upon the pleadings and evidence as then presented. At that stage of the case, the Court, instead of the party, is to take the objection of multifariousness, and, while it may refuse to render a decree upon multifarious subjects of litigation, in respect to which complete justice cannot be done, it will not, on the other hand, *sua sponte*, take the objection of multifariousness, when it would be merely technical, and when the object for which the parties have incurred their expense and for which the Court has been put to the trouble of a hearing and examination, can be substantially accomplished on the record as it stands. Upon this subject in general,

the views expressed by Mr. Justice Christiancy in *Wales v. Newbould, 9 Mich., 81,* are fully adopted by the Court, and are decisive upon this objection in the present case.

In the present case Avery is interested in all the matters embraced in the bill, so that as to him the Court might make a decree covering them all. He is consequently not in position to take the objection of multifariousness. The other defendants, being all proper parties as regards one subject matter of relief, were under no obligation to take part in the litigation or incur expense except as to that one subject matter, and they are no more inconvenienced or prejudiced by the other demands being joined than defendants necessarily are in many cases where they have several interests, and may have several defenses, but are nevertheless necessarily made parties, because another defendant through whom they derive their interests is interested in the whole subject matter of litigation, and that subject matter is not severable, and the complainant consequently can only obtain complete relief by bringing all these parties in. This is often the case in foreclosures, where the mortgagor has made subsequent conveyances in parcels, and sometimes also in suits for partition, specific performance and other suits regarding lands. But in all these cases each defendant confines his litigation to a protection of his own interest, and does not concern himself with either the pleadings or evidence so far as they affect only others. The claim, therefore, that a suit should be dismissed because a defendant is not concerned in a certain branch of it, is sometimes of a purely technical character, and ought to be made at the earliest admissible opportunity. In the present case it is brought to the notice of the Court not at the first but at the last opportunity, after the inconvenience, if any, has been suffered, and when the principal result of allowing it would be to compel as well the judicial tribu-

nals as the parties to go a second time over the same grounds of controversy, before a decision upon the merits can be reached. Under such circumstances the objection has no merit, and the Court are obviously bound to consult alike the interest of the parties and their own convenience by declining to take it. All the parties are interested in the foreclosure of the mortgage to the extent of the twenty-five thousand dollars and interest thereon; and that subject matter can be fully disposed of by our decree in this suit so to do complete justice between the parties. And if some of the other matters set out in the bill cannot be properly considered in the same suit, we have only to dismiss them from consideration, and leave the complainant to such other remedy regarding them as he may be advised to pursue.

The answer of Avery gives a history of the transactions between himself and complainant, different in several particulars from that set out in the bill. Avery denies that complainant trusted or said he would trust, or intimated in any way that he did trust any matter or paper or transaction in relation to such sale and purchase, or anything in relation thereto, with said Avery as complainant's legal adviser or counsel; denies that by either of the bonds, or by any understanding or stipulation, written or verbal, complainant had any ground for believing that he was to receive all the proceeds of the sales of Avery's moiety of the land, and avers that complainant well knew that by the terms of the first bond he was to receive two-thirds of the proceeds only, and by the terms of the second bond one-half of such proceeds only, and that on the receipt of the same his mortgage lien on any parcel sold was to be extinguished; avers that by the execution of the bond and mortgage the preliminary agreement was terminated, excepting only as to the obligation of Avery to manage and take charge of the defense to the ejectment suits against complainant before

mentioned, which it was mutually understood between the parties formed the true purpose and consideration moving the complainant to said sale, and the taking of said bond and mortgage; "denies that said bond has the construction that no interest is chargeable against Avery on the proceeds of sales retained by him, and avers that both he and the said complainant have acted upon the understanding and construction of said last bond, that such interest was chargeable, and have passed vouchers and stipulations to that effect, one to the other, and that settlements to a large amount have been had from time to time between the parties, recognizing and fully establishing defendant, Avery's, liability to allow such interest on all proceeds retained by him, according to the plain terms of said bond, and the plain understanding of the parties to the same;" avers that all business and social intercourse was discontinued between the parties by their concurrent and mutual act in the autumn of 1857, but that Avery has ever stood ready to join in sales of the joint property, and has made efforts to effect sales, but that complainant has strangely and unreasonably refused to join in advantageous sales which he has negotiated; insists that by the bond in no circumstance was Avery to become liable for the payment of the twenty-five thousand dollars in any other manner than out of the proceeds of the sales of the lands, in the proportions therein mentioned, and that there was to be no personal liability resting upon Avery to make good the full amount except by passing over to complainant his share of the proceeds of sales made fairly and in good faith; and that upon such sale, when his share of the proceeds was passed over, all complainant's interest in and lien upon the parcel sold was to cease; admits that one principal object which complainant had in view in the arrangement with Avery, and in receiving for the land a less sum than its value, was to be

relieved of the care and trouble of looking after the eject-
ment suits, and to secure Avery's services without further
charge, in assisting in the defense of said ejectment
suits; gives reasons why such services were expected to
to be valuable, and avers that they were successfully ren-
dered, and sets forth various other matters which may be
important on an account being gone into, but which need
not be recapitulated here.

The several other defendants, while insisting upon the
same matters of defense relied upon by Avery, also claim
the benefit of their purchases; the defendant, the Garland
Street Methodist Church, claims that the lot conveyed to
it was a mutual donation by both Payne and Avery by
mutual agreement, and therefore equitably released from
Payne's mortgage; the defendant, the Flint & Pere Mar-
quette Railway Company, insist that by the terms of the
agreement between Payne and Avery, and to carry into
effect the object for which their arrangement was made,
Avery was authorized to sell and convey the equitable inter-
est in the whole lands, as his deeds to the Railway Com-
pany purported to do, and the defendants, Henry H. Crapo
and Lucy A. Chase, make the like claim as regards the
conveyances by Avery to themselves respectively.

These answers were put in issue by replications, and
voluminous testimony, including that of both the parties,
has been taken. Although as we review the record we find
many matters in respect to which the actual facts may be
left in doubt, yet we think the main facts in the case are
placed by the pleadings and evidence beyond all contro-
versy, and that we can proceed to dispose of the case with-
out any solicitude lest the equities of the parties may not
have been fully presented.

And *first*, we think it perfectly established that the prin-
cipal inducement on the part of Payne in entering into

the arrangement with Avery was that he might place all his business connected with said lands in the hands of an attorney of, skill, ability and integrity, in whose capacity, acquirements and honesty he could place entire reliance, not only so far as he might employ him in the management of the ejectment suits, but particularly in the care, control and sale of the real estate afterwards, and in a proper account of the moneys which the business should bring to his hands.

*Second.* We think, relying upon Avery being such a man, Payne, with Avery's full knowledge and concurrence, entrusted him to draw up all the papers between them, and that in doing so, and in all the conversations relating thereto, Avery occupied the two-fold and very difficult position of purchaser and confidential legal adviser, and was bound to observe the utmost good faith towards Payne, and not only to abstain from any deception and over-reaching, but to draft all papers with sufficient care and professional skill to make them express the real understanding and agreement of the parties, so far as was essential to the protection of Payne's interest.

*Third.* That Avery was actually allowed in the sale, by a deduction of that amount from the value of the interest sold him, the sum of ten thousand dollars, for the services expected to be rendered by him in connection with the pending ejectment suits, and the subsequent care, management and sale of the joint property, but so far as we can judge from this record, the principal value of such services was expected to consist in the attention to be given to the management and sale of the property; and the assistance in the ejectment suits, in the result of which the parties do not appear to have felt any great concern, was comparatively a minor consideration.

And before proceeding further we will consider what is

.the true construction of the agreement between the parties regarding the payment over by Avery of the proceeds of sales of his moiety of the joint property, in regard to which the parties are at issue, and this issue presenting one of the principal subjects of controversy in the case. It will be borne in mind that the written agreement between the parties bound Avery to pay over " two-thirds, or such other proportion as said Avery may find convenient and practicable of the proceeds of such sales," and seven per cent. interest on all retained in his hands, while the second bond, given by Avery in substitution for the first, provides that " one-half of the said proceeds, whether the same be in cash or securities, to be delivered over to said Payne, his executors, administrators or assigns, to be endorsed as payments on his bond, said Avery to be charged with interest on all securities while they remain in his hands before delivery of the same to said Payne, and seven per cent. interest upon the cash proceeds while the same remain in his hands, to be paid, as above provided, out of said proceeds." The modification of the arrangement so as to provide for the payment over of one-half only of the proceeds instead of two-thirds, as first contemplated, Avery insists was by the consent of Payne, but as it does not appear to us of particular importance in the disposition of the cause, we shall not trouble ourselves to consider any question of veracity which may exist between him and Payne upon that subject.

We understand Avery to claim that the true construction of the original agreement and of the bond is, that in no event was he to be under obligation to pay over to Payne any more than the proportion of the proceeds of the sales of his moiety specified therein, and if, doing so, the full amount of the twenty-five thousand dollars failed to be paid, the loss would fall upon Payne. In other words,

in addition to the large sum that was allowed him for his services by being deducted from the value of the land in the sale, he was to be allowed the further sum of twenty-five per cent. of all the proceeds of sales for his services in making the same, and in case they should be sufficiently large so that one-fourth the proceeds would more than pay off the Payne mortgage, then he was to have fifty per cent. of the overplus. To show how this would work, we have only to suppose that Avery had proceeded speedily and rapidly to make sales of the lands as contemplated, and it will be seen that unless the increase in price was entirely beyond what could reasonably be expected in interior towns, the inevitable result must have been to discharge Payne's mortgage by the payment of very much less than its face, while Avery, retaining one-fourth of all sales as his own, would thus receive for his services a sum that could only be characterized as enormous. We need hardly say that an arrangement of this character would be so extraordinary that we should not be prepared to discover it in any written contract between reasonable persons unless clearly expressed and evidently entered into upon deliberation; and if we assume that the parties fully expected and believed that the proceeds of one-fourth the land would more than pay the purchase price of the half and the interest upon the proceeds of any portion thereof that might not be immediately paid over, it would be equally difficult to believe that they deliberately agreed that Avery should have for his services in no event less than twenty-five thousand dollars, and one-half of all the surplus over one hundred thousand, if the sales should exceed that sum. Men do not deliberately make with others, on a basis of mere business and pecuniary advantage to themselves, arrangements in which such large compensation is made for services which can be readily and much more cheaply procured.

21 MICH.—Q³.

We have already seen that Avery admits he was to pay interest on all that portion of the proceeds of his moiety which was retained in his own hands. Why pay interest upon it if it belonged to him? And if he was to pay interest, when was the payment to cease? So far as we can understand his position, he was to pay interest indefinitely on a fund which belonged to himself, and which, under the written contract binding him to pay over "two-thirds or such other proportion as he might find convenient and practicable," he might make larger or smaller at his option, according as he might make it convenient or not, to pay over. In other words, Payne surrendered his interests to Avery's convenience and discretion without remedy. It was urged on the argument by the counsel for Avery, that it must have been understood that Avery was to support himself from proceeds of sales while they were being made; and that it would therefore be unreasonable to suppose he would put himself in position to be obliged to account for the whole proceeds. The record, however, affords us no support for this suggestion. It does not appear that Avery was a man without other means, or that it was expected he would not pursue regularly his professional calling. Avery himself testifies that after he came to Flint he performed professional services for Payne, for which he was paid; and the natural influence of an arrangement of the character entered into, showing, as it would, the large confidence reposed in Avery by a man well known and of large means, would be to give him immediate prominence and tend to bring professional business, if he saw fit to transact it. We have no reason to suppose that such was not the expectation on both sides, and though the papers show that it was expected Avery would retain in his hands a portion of the proceeds, it is so entirely clear that that portion was understood to

belong to Payne until his mortgage was paid, that we cannot doubt the retaining of any portion by Avery was regarded as a mere temporary arrangement and by way of accommodation rather than as giving to Avery any rights. In this view Payne might well accept as truthful, the statement of Avery, that the provision requiring the latter to pay over a certain proportion was inserted in the papers for the protection and security of Payne; in other words, as a distinct expression of their understanding that Avery should not at any time, for any temporary purpose, retain in his hands more than a certain proportion of the proceeds, and that upon such proportion he should pay interest until payment was made.

The position that Payne would be placed in by the opposite construction is well illustrated by the claim now made on behalf of Avery, that the donations made by him to the Garland Street Methodist Church and to the city of Flint, were not to be accounted for by him to Payne, notwithstanding the lands donated were to be, as he claims, released from the lien of Payne's mortgage; in other words, if one-half the proceeds of his moiety of the lands failed to pay the purchase price of the whole, including the interest account, these liberal donations by Avery were to be made at Payne's expense. Now, however convenient and desirable it may be for a person to be suffered to be liberal at the expense of another, it is so unusual for the party who is to suffer it to · stipulate for it in advance, that one would naturally look in his contracts for a consent thereto with considerable incredulity. In this case we fail to discover such a stipulation, and we must therefore suppose that the parties intended the generosity of each to be displayed at his own expense and not at the expense of the other.

After a careful consideration of the arguments of counsel and of the record upon which they are based, we have

not the least doubt that it was the understanding of the parties that the proceeds of the sales of Avery's moiety of the lands belonged to Payne until his mortgage was paid.      So far as Avery might pay them over to Payne on the conclusion of sales, they were to be immediately applied on the mortgage, and so far as they were retained for any period, long or short, Avery was to pay interest upon them until they were paid over.  Such being the understanding of the parties, it was the duty of Avery, as trusted confidential adviser and counsel, and by that relation placed under obligation to protect the interest of Payne with a scrupulousness at least equal to that with which he would protect his own, to see to it that this understanding was clearly expressed in the contract and bond, and we should attribute to him a want of good faith, a want of business integrity and of professional honor, if we should sustain the construction now put upon them in his interest.  We are far from attributing to this defendant any such dishonorable conduct.  On the contrary, we think his papers, though somewhat blindly drawn, do, nevertheless, express the real agreement of the parties as we have found it to be; and we must believe the construction now insisted upon to be an afterthought suggested by the contentions, litigations and consequent animosities which have sprung up between the parties, and which at last have probably made any apparent legal advantage seem right to either.

The proceeds of the sales belonging thus to Payne, any arrangement by which Avery was allowed to retain any portion thereof was entirely at the discretion of Payne, and subject to be terminated whenever in his opinion his interest required it.   There was no agreement on his part that such arrangement should continue for any particular period, and he had not only a legal right to terminate it at will, but we think also that he was, on equitable

grounds, justified in so doing when Avery asserted a right to retain a portion as his own property, so that Payne found that not only were his payments to be postponed indefinitely, but that his security also was prejudiced. If the moneys were his, it was highly unjust and unreasonable that he should be compelled, in order to obtain any payment whatever, to consent to sales, from the proceeds of which he was to receive only one-half the sum properly coming to him, and at the same time surrender a proportion of the security for the remainder exactly equal to the amount retained. When Avery insisted on converting the indulgence which Payne had extended to him into a legal right, we think Payne was justified in protecting his interest in the manner he insisted upon, and that if Avery made this an excuse for declining to make further sales, the blame is legally to be laid at his door, and not at the door of Payne.

It is therefore our opinion that when the sales of the joint property ceased, it was through the fault of Avery; and his afterwards filing a bill for the partition of the joint property, and keeping it in litigation for several years, was so hostile to the spirit of the original arrangement, and such a clear repudiation of his duty to proceed and perform the services contemplated thereby, as to justify Payne in proceedings to enforce his mortgage.

We have now to see what were the responsibilities which this repudiation by Avery of his obligation to perform services for Payne in making sales of the joint property imposed upon him. On the part of Payne it is contended that inasmuch as Avery has refused, without legal excuse, to perform the agreed services for which the sum of ten thousand dollars was allowed him in the sale, he should be held liable in this suit for the sum thus received. As the mortgage does not cover this amount, the claim must be based

PAYNE *v.* AVERY.

upon the idea, either that the papers taken together constitute an equitable mortgage in favor of Payne for the full sum that may be found equitably payable to him, on a full examination of the transactions which are evidenced by these papers, or on the other hand, that Payne, having taken securities to the amount of $25,000 of the $35,000, for which the lands were actually sold to Avery, has a vendor's lien upon the lands for the remaining $10,000 upon the general principles governing sales of lands.

We are satisfied, however, that though Avery was in default as before stated, we cannot afford Payne relief in respect thereto in the present suit. There is an inherent difficulty, growing out of the peculiar nature of the transaction and the character of the services to be performed, which will preclude any attempt on our part to estimate in this case the pecuniary loss in consequence of the breach of the contract. All the evidence to be found in this record, whether put in on the one side or the other, tends to show that when Payne formed the arrangement with Avery, he did so largely influenced by a consideration of the attainments and personal qualities which Avery was supposed to possess. He believed him to be a man familiar with Indian affairs and Indian character, and whose knowledge in that direction would be useful in the pending litigation; a lawyer of ability, whose opinions in land matters would be trustworthy; a gentleman of high social qualities, with whom business relations would be eminently agreeable, and a man in every respect entirely deserving of the fullest confidence, and in whose hands he could implicitly trust his large interests, dismissing from his own mind any solicitude concerning them; and all these circumstances entered into the account and influenced his mind in fixing upon the deduction to be allowed from the purchase price in making the sale. How shall any one but himself

determine what proportion of the ten thousand dollars his estimate of any one of these valuable qualities constituted, or what was his relative estimate of all, as compared with the value of services which might be performed by others, and which consequently may be said to have had a market value? Indeed, it is probable that Payne himself would find it impossible at this time to determine satisfactorily to his own mind how far he was influenced by any one of several considerations in making the arrangement with Avery; and for the Court to attempt to put themselves in Payne's position, and to undertake to place a money value upon considerations which obviously cannot be measured by a pecuniary standard, thereby substituting for the judgment of the parties the judgment of the Court; how far the various elements entering into the consideration should have had relative influence, when it is impossible to determine whether in the mind of the contracting party they actually had such influence or not, would be an attempt, which, if to be made at all, must be in a different proceeding from the present. In the case of *Campbell v. Campbell*, decided at the present term [*supra p. 438*], where in a partition case a claim was made for improvements, we had occasion to hold that where parties stipulated with each other for a variety of things at a gross consideration, some of which were not capable of a money estimation, and the Court had no possible means of determining how each of these things was estimated by them, and consequently had no standard whatever, beyond what vague conjecture would supply, by which to judge of the relative importance of each in the mind of the parties, the inherent difficulty, which was one the parties themselves had created, was such as would preclude the Court from attempting any such relative estimate, and declaring an equitable lien based thereon.

Without, therefore, undertaking to say whether Payne would or would not have a remedy at law for damages occasioned by this breach of the agreement, we shall dismiss this claim from consideration in the present case, on the ground that the damages are of that uncertain character, and the elements which constitute them so uncertain and intangible that they constitute neither the proper subject of an equitable mortgage, nor of a vendor's lien. Either the one or the other of these requires something definite and certain in its nature; something which, if not fixed in amount, is at least capable of being measured by some pecuniary standard, and cannot be made to cover damages where the means of estimation are so vague and conjectural as here.

Nor can we consider in this suit the accounts of the parties respectively touching the rents, issues and profits of the joint property, or the improvements and repairs made or waste committed thereon. Those matters will more properly be considered in proceedings between Payne and Avery to settle their relative rights as tenants in common, as it is from that relation that their respective claims have sprung. But wherever Payne, in order to protect his mortgage lien on Avery's half of the joint property has been obliged to pay Avery's taxes, we think he is entitled to add them to the amount for which his mortgage may be foreclosed.

It is impossible for us to determine now, with any degree of certainty, within what time Avery would have paid off the mortgage had he proceeded to make sales and pay over the proceeds. It is not probable payment would have been made in full so early as May 17, 1859, when his bill for partition was filed, but it is likely that a very large proportion of the whole would have been paid, or upon interest, by that day. Payne certainly lost the benefit of

several sales which might have been previously made, one of which, negotiated in August, 1857, was large enough to pay off more than a fourth, and with previous sales more than a moiety of the whole. We see no reason to suppose that if Avery should be charged interest on the unpaid portion from the time he repudiated the arrangement by filing his partition bill, Payne would receive a full equivalent for what he had a right to in that regard. But having no means of determining definitely how this might be, and thinking Avery justly chargeable with interest from that time, we decree accordingly.

In the Court below, by consent of parties, the cause was referred to a referee under a stipulation that the Court should enter such decree as he should award, but saving to the parties the right of appeal. The learned gentleman who was made the referee, with the very best intentions towards each party, proceeded, instead of directing a decree upon the issues made, to order a partition of the property held in common. Obviously, in so doing, he went beyond the authority conferred. If we had the power to adopt his conclusions it might be equally just and beneficial to the parties, but even a court of equity can only do justice with reference to the allegations made and the relief prayed for. The foreclosure of a mortgage is what the one party seeks and the other contends against, and we must either grant that relief or we must deny it. The decree of the Circuit Court in Chancery must, therefore, be reversed and vacated, and, as we find the complainant entitled to a foreclosure, we have only to settle the principle of accounting, and to determine the relative rights and liabilities of the parties in regard thereto.

The several defendants, who have received conveyances or mortgages from Avery, without obtaining the complainant's release, have received them subject to the lien of

21 MICH.—R³.

PAYNE *v.* AVERY.

Payne's mortgage. They are nevertheless entitled, on well understood principles, to have all that remains unsold in Avery's hands first sold to satisfy Payne's demand, before resort shall be had to the lands embraced in their deeds and mortgages, and as between themselves, these lands are to be liable in the inverse order in which they have thus acquired their rights respectively. These defendants, also, had a right to be governed by the record in determining the amount of Payne's claim; and as that put it at twenty-five thousand dollars, Payne cannot, as against them, enforce it for the additional claim for interest upon the annual income of the productive property, notwithstanding that is covered by the mortgage as against Avery. These defendants also had a right to suppose that the payments being made by Avery from time to time were made in reduction of the $25,000, and they must be so applied. But the taxes paid by Payne upon Avery's interest should, with the like reason, go to increase this amount, and the account, as against them, should be taken including these sums. If a sale of the lands retained by Avery at the time of the filing of the bill should produce an insufficient sum to pay off the amount found due the complainant in the account taken, as against these defendants, resort will be had to the lands mortgaged or conveyed to them in the following order: *First*, to that conveyed in trust for the city of Flint; *second*, to the parcel conveyed to Reynolds; *third*, to the parcel last conveyed to the railway company; *fourth*, to that conveyed to Chase; *fifth*, to that conveyed to Prescott and Crapo; *sixth*, to the parcel first conveyed to the railway company; *seventh*, to that mortgaged to Wilson; and *eighth*, to that deeded to the church. But as Avery was still the owner of an equity of redemption, after mortgaging to Wilson, and the subsequent purchasers have a right to have the value of that interest

applied on this mortgage before their purchases are sold, any one of them may, at his option, by serving notice upon the officer making the sale, require the lot mortgaged to Wilson to be sold before his own, and in that case the same shall be sold accordingly; but the officer shall retain in his hands, of the proceeds thereof, such sum as shall be claimed by Wilson to be owing on his mortgage, and pay the same into Court to abide the order of the Court, unless it shall be necessary to apply them in satisfaction of complainant's mortgage before resorting to the church lot as above provided, in which case the whole proceeds, or so much thereof as should be necessary for that purpose, should be paid to complainant.

If enough should be realized from the other lands to satisfy the amount found due as against these subsequent purchasers and the costs, their purchases will be thereby released from the lien of the mortgage, except that in any event the equity of redemption which Avery has in the lot mortgaged to Wilson will be subject to sale to satisfy any amount found due to complainant and covered by the mortgage as against Avery. And as against Avery the mortgage is adjudged to cover not only the twenty-five thousand dollars and the taxes as above specified, but also the interest upon the income of the productive property as specified in the bond which now accompanies the mortgage.

We have made a computation of the amount due the complainant on the principles here declared, and find the sum which is properly owing thereon as against all the defendants to be the sum of $34,248 05. In addition to this the further sum of $8,624 46, is secured by it as against Avery, and for these sums a decree of foreclosure and sale should be entered. The sale should take place at any time after six months from the date hereof, unless the sums due and costs are previously paid. The complainant is entitled to

costs of both Courts, and the defendant, the Flint and Pere Marquette Railway company, being justified in coming to this Court to be relieved from the decree appealed from, should also recover costs of this Court as against Avery.

In computing the amount due, we have charged Avery with interest on the amounts retained by him up to May 17, 1859, and adding that to the twenty-five thousand dollars, have then deducted all payments previously made. As the payments since have at no time equaled the interest, we have computed interest on the balance then remaining due on the mortgage to this day, and adding thereto the amount of taxes paid by Payne with interest, have then deducted the payments with the result above stated.

The cause will be remitted to the Court below for the execution of the decree.

The other Justices concurred.